**SOUTHWESTERN BELL TELEPHONE COMPANY, Petitioner,**

v.

**FDP CORPORATION, Respondent.**

No. C–7551.

Supreme Court of Texas.

June 19, 1991.

Richard P. Keeton, Houston, Steve Selby, W. Page Keeton, Austin, Alex Guevara, Jr., Houston, for petitioner.

Theodore C. Flick, Jon Mercer, Houston, for respondent.

## OPINION ON MOTION
## FOR REHEARING

PHILLIPS, Chief Justice.

Respondent's motion for rehearing is granted. Our opinion of March 6, 1991 is withdrawn, and the following is substituted in its place.

The issue in this case is whether a seller's partial failure to perform under a sales agreement may serve as the basis for a breach of warranty claim under the Texas Deceptive Trade Practice—Consumer Protection Act, TEX.BUS. & COM.CODE §§ 17.41–17.63 (the "DTPA"). The court of appeals held that certain oral statements made by the seller to induce a sale constituted an express warranty, and that the seller's failure to perform one of the items in the contract was a breach of that warranty. 749 S.W.2d 569. The court further held that a contractual limitation of damages clause could not limit the buyer's recovery under the DTPA for the breach of warranty. We disagree with the latter conclusion. We hold that the limitation clause was part of the warranty upon which the buyer's claim is based and it therefore limits his recovery. We reverse the judgment of the court of appeals and render judgment that FDP Corporation take nothing.

Frank Prasek, the president of FDP Corporation, met with Max Williams, a Southwestern Bell representative, in early 1980 to discuss advertising in the next edition of the Houston Yellow Pages. During this meeting, Prasek complained that a previous Yellow Pages advertisement for FDP had contained an error in its text. Williams assured Prasek that the new advertisement would be published correctly. Bell and FDP then executed a written advertising contract calling for a boldface listing of FDP's hair design business under "BARBERS," a boldface listing under "BEAUTY SALONS," a double quarter column display under "BARBERS," and a cross reference under "BEAUTY SALONS" to that display.

When the Yellow Pages was published in June, 1980, the boldface listings and the cross reference appeared without error, but the display was not included. Bell nevertheless billed FDP for all the items. Under protest, FDP made several installment payments. In January 1981, Bell finally realized its mistake and returned the sums previously paid by FDP for the omitted display. Thereafter, FDP's attorney made a written demand that Bell reimburse FDP

for lost profits allegedly caused by Bell's failure to publish the advertisement. When Bell did not meet this demand, FDP filed suit, alleging negligence and violation of the DTPA.

FDP's claims were tried to a jury, which returned a verdict generally favorable to Bell. The jury failed to find that the omission of the advertisement was caused by Bell's negligence, that Bell committed any "laundry list" violations under the DTPA, or that Bell was responsible for any unconscionable action or course of action under the DTPA.[1] *See* TEX.BUS. & COM.CODE §§ 17.46(b), 17.50(a)(3). The jury did find, however, that Bell expressly warranted that it would publish FDP's advertisement, that Bell breached the warranty, and that the breach was a producing cause of damages to FDP. Nevertheless, the jury found that FDP incurred no lost profits, which was the only element of damages submitted. Based on this verdict, the trial court rendered judgment that FDP take nothing, and FDP appealed.

The court of appeals reversed the judgment of the trial court. The court found sufficient evidence to support the jury's findings of breach of warranty and producing cause, and held that the jury's failure to find damages was against the great weight and preponderance of the evidence. The court of appeals therefore remanded the cause for a new trial, and Bell appealed to this court.

Bell argues that FDP's only claim is for breach of contract, not breach of warranty. It asserts that a warranty is a guarantee to accomplish a result or a guarantee of the truth of an assertion. According to Bell,

Williams' statements at most constitute a promise to perform in the future, not a guarantee of performance. Thus, Bell concludes, no express warranty was made. If a warranty was created, Bell asserts that its liability for breach is limited under the advertising contract to return of the money FDP paid for the display.

FDP argues that a warranty need not be an absolute guarantee and the seller need not intend to create a warranty. According to FDP, a promise to perform an act in the future can be a warranty just like any other promise or affirmation. FDP further argues that it relied on Williams' statements and it would be unfair not to enforce them. Finally, FDP asserts that the contractual liability limitation is unenforceable either because it is an invalid liquidated damages provision or because such a waiver violates the policy of the DTPA. TEX. BUS. & COM.CODE § 17.42.

■ Our first inquiry is whether FDP's allegations state a claim for breach of warranty, which is actionable under the DTPA, or merely a claim for breach of contract. Because Bell's sale of advertising is predominantly a service transaction, not a sale of goods, the warranty provisions of Article Two of the Uniform Commercial Code ("UCC") do not explicitly govern this case. *See* TEX.BUS. & COM.CODE § 2.102 (Tex. UCC). Therefore, we begin this inquiry by examining the common law of warranty.

Although it is well-established that express warranties are enforced in service transactions, *see Hawkins v. McGee*, 84 N.H. 114, 146 A. 641 (1929), warranty law has primarily developed in the context of

---

**1.** The Jury responded "no" to the following questions relevant to Bell's liability under the DTPA:

"Do you find that Defendant represented to Plaintiff that the agreement conferred or involved rights, remedies or obligations (namely, that Defendant would publish Plaintiff's advertisement and do so correctly) which it did not have or involve?

Do you find that Defendant represented to Plaintiff that Defendant's services had characteristics, uses or benefits (namely, that Plaintiff's advertisement would be published and

would attract customers) which they did not have?

Do you find that Defendant failed to disclose to Plaintiff information (namely, that Plaintiff's advertisement might be omitted) concerning Defendant's services which was known at the time of the transaction?

Do you find that Defendant's action or course of action in connection with the sale, failure to publish and billing on Plaintiff's Yellow Pages advertisement was unconscionable?

Do you find that the limitation of liability clause in the agreement between Plaintiff and Defendant is unconscionable?"

the sale of goods. Scholars have traced its historical roots back to 13th and 14th century England. *See, e.g.,* B. CLARK & C. SMITH, THE LAW OF PRODUCT WARRANTIES 1–1 to 1–13 (1984); Sullivan, *Innovation in the Law of Warranty: The Burden of Reform,* 32 HASTINGS L.J. 341, 343–351 (1980). Early English courts, established specifically to resolve disputes among traders, required sellers to rectify any defect in the goods they sold, even if the sellers were unaware of the defect when they sold them. Hamilton, *The Ancient Maxim Caveat Emptor,* 40 YALE L.J. 1133, 1158–59 (1931). By the middle of the nineteenth century, however, most courts embraced a doctrine more conducive to an expanding market economy. As William Wetmore Story wrote in 1844, "The general rule of law, applicable to all sales, is, that the buyer buys at his own risk; *caveat emptor.*" W. STORY, 2A TREATISE ON THE LAW OF CONTRACTS 333 (4th ed. 1856).

During this period, a seller could still be held liable for a defect inconsistent with an express warranty, but such warranties were created only if the seller used the particular words warrant or guarantee. As one commentator noted, "mere affirmations or general expressions of quality would not suffice." Sullivan, *supra,* at 347. Moreover, even when a seller gave an explicit express warranty, such a warranty was viewed as collateral to the main contract. Indeed, Story introduced his chapter on warranties by stating: "The question which comes naturally next in order, *after the contract of sale is completed, and the goods are reduced to the possession of the vendee,* is, whether the goods are the quality and nature which the vendee intended to buy." STORY, *supra,* at 333 (emphasis added).

As the twentieth century approached, the doctrine of caveat emptor no longer seemed to fit the changing American commercial setting. Sullivan, *supra,* at 355–58. Mass production and transactions between distant parties limited buyers' opportunities to inspect. "The law responded to these changes by a gradual recession of the doctrine of caveat emptor and expansion of implied warranties." *Id.* at 356. Along with the adoption of implied warranties came a relaxation of the requirements for creating express warranties.

Just after the turn of the century, the Uniform Sales Act (USA) codified the trend toward increased warranty liability. The USA, which was never adopted in Texas, provided for the implied warranties of merchantability and fitness for a particular purpose. USA § 15 (1906). It also codified the concept that no particular words are necessary to create an express warranty. *Id.* at § 12. Nearly fifty years later, the UCC carried forward the USA's codification of warranty law. Article Two of the Code has been adopted by every state except Louisiana, and it is the primary influence on modern warranty law. Sullivan, *supra,* at 389.

This historical review illustrates that, although they may have helped accelerate emerging, pro-consumer trends, the two uniform acts upon which most twentieth century warranty cases are based essentially codified the common law of warranty. *See also* TEX.BUS. & COM.CODE § 1.103. This observation is especially true with respect to express warranties,[2] which never faced the degree of judicial antipathy with which implied warranties were viewed in the nineteenth century. Thus, although the case at bar involves a service transaction, reference to the Code is instructive. *See also* TEX.BUS. & COM.CODE § 2.313 (Comment 2); 1 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE 25 (3rd ed. 1988); Special Project,

---

**2.** The possible exception to this observation concerns whether a buyer must demonstrate that he relied on the seller's expression. The USA had preserved the common-law rule that an affirmation or promise could become an express warranty if "the buyer purchases the goods relying thereon." USA § 12. The UCC, however, provides that the buyer must show that the seller's representation became a "basis of the bargain."

TEX.BUS. & COM.CODE § 2.313. Courts and commentators are divided on the extent to which this phrase abrogates the common-law requirement of reliance. For an excellent argument that the UCC intentionally discarded the reliance requirement, see Heckman, *"Reliance" or "Common Honesty of Speech": The History and Interpretation of Section 2-313 of the Uniform Commercial Code,* 38 CASE W.RES. 1 (1987).

*Article Two Warranties in Commercial Transactions: An Update,* 72 CORNELL L.REV. 1159, 1201 (1987).

■ The UCC recognizes that breach of contract and breach of warranty are not the same cause of action. The remedies for breach of contract are set forth in section 2.711, and are available to a buyer "[w]here the seller fails to make delivery." TEX.BUS. & COM.CODE § 2.711(a). The remedies for breach of warranty, however, are set forth in section 2.714, and are available to a buyer who has finally accepted goods, but discovers that the goods are defective in some manner. TEX.BUS. & COM.CODE § 2.714, § 2.711 (Comment 1); *see also* 1 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE 501 (3rd ed. 1988). Indeed, "the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell." TEX.BUS. & COM. CODE § 2.313 (Comment 4). No sound reason exists to apply a different standard when the contract is for services instead of goods.[3] In light of the forgoing discussion of the purpose and rationale for warranty liability, we reject Bell's argument that its failure to publish the double quarter column display was exclusively a breach of contract.

We hold that Bell's omission of the display was a defect in the performance of its advertising contract. FDP purchased a package of advertising service; Bell delivered most of the services it agreed to provide, but by omitting a critical item, it delivered an incomplete package. As the directory was published only once per year, FDP had no alternative but to accept the advertising package Bell delivered, even though it was different from and less desirable than what Bell had in essence agreed to sell. Thus, there is some evidence to support the jury's finding that the defect in Bell's performance constituted a breach of

its warranty to publish FDP's advertising correctly.

■ Having concluded that Bell made and breached an express warranty, the next issue is whether its liability for that breach can be limited by the written advertising contract, which provides in part:

The applicant agrees that the Telephone Company shall not be liable for errors in or omissions of the directory advertising beyond the amount paid for the directory advertising omitted, or in which errors occur, for the issue life of the directory involved.

The court of appeals held this provision invalid under the DTPA's policy against waiver of consumers' statutory rights. TEX.BUS. & COM.CODE § 17.42. The court based this holding on *Martin v. Lou Poliquin Enterprises, Inc.,* 696 S.W.2d 180 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.), and *Hycel, Inc. v. Wittstruck,* 690 S.W.2d 914 (Tex.App.—Waco 1985, writ dism'd). *Hycel* held that a seller may not use a contractual liquidated damages provision to limit a consumer's recovery for the commission of a deceptive trade practice specifically described and prohibited under the DTPA "laundry list." TEX.BUS. & COM. CODE § 17.46(b). *Martin* held that a liability limitation clause could not limit recovery under the DTPA, but it did not describe which provision of the DTPA gave rise to the liability.

We agree that a liability limitation would be invalid under § 17.42 insofar as it purported to waive liability for an act defined as deceptive under § 17.46(b). Unlike a "laundry list" claim, however, an action for breach of warranty is not a creation of the Act. *La Sara Grain v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 565 (Tex. 1984). Because claims for breach of warranty derive from common-law principles or other statutory provisions, we must consult these sources in determining the nature

---

**3.** The trial court relied upon the UCC in defining express warranty for the jury. Neither party contests the submitted definition, which provided:

You are instructed that an "express warranty" is any affirmation of fact or a promise made by a seller to a buyer which relates to the

subject matter of the agreement and becomes a part of the basis of the bargain. It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that the seller have a specific intention to make a warranty.

and extent of warranties. *Id.* For example, the UCC creates an implied warranty of merchantability, and it also allows sellers to disclaim the warranty if certain specific prerequisites are met. TEX.BUS. & COM. CODE § 2.316; *see also Cate v. Dover Corp.*, 790 S.W.2d 559 (Tex.1990). Such a disclaimer does not offend the "no waiver" provision in a suit for breach of warranty under the DTPA. *See Singleton v. LaCoure*, 712 S.W.2d 757, 760 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.).

Pursuant to the UCC's definition of express warranty, the jury found that Bell's promise to publish the advertising accurately became "a part of the basis of the bargain." Another part of the basis of the bargain was FDP's agreement to limit Bell's liability to the return of the amount paid for the omitted or erroneous items. Thus, Bell gave a limited warranty. The jury failed to find that the limitation of Bell's liability was unconscionable or that Bell violated the DTPA. Under these circumstances, the court of appeals erred in failing to enforce the parties' agreement to limit Bell's liability.

The court of appeals also held that the jury's finding that FDP should recover no lost profits damages from Bell was against the great weight and preponderance of the evidence. Because we have held that the liability limit was part of the warranty, however, any jury finding regarding lost profits is irrelevant. When Bell omitted FDP's display from the 1980 Yellow Pages, Bell's contractual obligation to FDP was to return the money FDP paid for that display.

FDP also argued in the court of appeals that the jury's failure to find Bell negligent was against the great weight and preponderance of the evidence. The court of appeals did not reach this issue because it concluded that a remand was necessary for other reasons. Because the basis for the court's remand is erroneous and because FDP's alternative argument for a remand challenges the factual sufficiency of the evidence, we would normally remand this cause to the court of appeals. *Stanglin v. Keda Development Corp.*, 713 S.W.2d 94,

95 (Tex.1986). We have recently concluded, however, that a claim of lost profits for failure to publish an advertisement in the Yellow Pages is cognizable in contract, but not in tort. *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493 (Tex. 1991). Under *DeLanney*, FDP states no cause of action for negligence; therefore, FDP's factual sufficiency point is moot.

The judgment of the court of appeals is reversed and judgment is rendered that FDP take nothing.

Dissenting opinion by DOGGETT, J., delivered March 6, 1991 is withdrawn.

Dissenting opinion on Motion for Rehearing by MAUZY, J.

MAUZY, Justice, dissenting.

I dissent. For the reasons stated in my dissent in *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493 (Tex. 1991), I would remand this cause to the court of appeals for consideration of whether the jury's failure to find Bell negligent was against the great weight and preponderance of the evidence.