CARLISLE CORPORATION d/b/a
Carlisle SynTec Systems,
Appellant,

v.

MEDICAL CITY DALLAS,
LTD., Appellee.

No. 05–04–00157–CV.

Court of Appeals of Texas,
Dallas.

June 27, 2006.

Michael L. Knapek and William David Ellerman, Jackson & Walker, L.L.P., Dallas, for Appellant.

Vernon Childs Howerton, Jenkins & Gilchrist, Dallas, for Appellee.

Before Justices MOSELEY, FRANCIS, and MAZZANT.

## OPINION

Opinion by Justice MOSELEY.

Carlisle Corporation d/b/a Carlisle Syn-Tec Systems appeals a jury verdict in favor of Medical City Dallas, Ltd. on Medical City's claim for breach of the Twenty Year Membrane Material Warranty, an express warranty for a roofing material manufactured by Carlisle and installed by Charley Company of Texas, and Medical City's claim for attorney's fees. Because we agree with Carlisle that an award of attorney's fees was error, we reverse the award of attorney's fees and render that Medical City take nothing on that claim. Concluding that the remainder of Carlisle's issues are without merit, we affirm the remainder of the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1991, Medical City hired Charley Company to "roof over" the roof of one of its buildings, Building B. Their agreement provided that Charley Company would install a rubber roofing material, Ethylene Propylene Dienemonomer (EPDM), manufactured by Carlisle, over the existing roof. The project was completed in March 1991. After the installation, Carlisle issued Medical City two Carlisle warranties. The first was the Carlisle Golden Seal Total Roofing System Warranty, which was a fifteen-year warranty from the date of completion of the roof installation. The second was the Carlisle Twenty Year Membrane Material Warranty, which warranted against premature deterioration because of weathering of the EPDM roofing material and which ran twenty years from March 18, 1991.

In July 1991, a seam of the roof leaked, and a Medical City employee reported the leak to Carlisle. Charley Company repaired the leak. In 1995 or 1996 "the leaks began to be more widespread, more in number, and more frequent after each rain." A Medical City employee called Carlisle about the leaks and was instructed to call Charley Company. In 1999, Medical City again contacted Carlisle about leaking, which was "continuous." In October 2000, Medical City employees, a Carlisle employee, and a Charley Company employee met to consider the volume of leaks and the unsuccessful patching. In December 2000, Carlisle sent a letter advising Medical City that, as a follow up to the October investigation and meeting, it was seeking management approval to have Charley Company "overlay seam."

In November 2000, Medical City had contracted with LRW Consultants, Inc. to

perform a roof analysis. On January 5, 2001, LRW reported that the membrane showed "premature aging" and specific defects such as carbonization, pinholes, and splits. In a February 23, 2001 letter, LRW reported its findings to Carlisle and set a deadline of March 5 for Carlisle's response. On March 29, 2001, Medical City's counsel sent a letter to Carlisle discussing the "deterioration and failure of the fully warranted roofing system," Carlisle's "failure to respond to [its] warranty obligations," and Medical City's plan to "take those steps necessary to protect its property." Medical City filed suit on July 20, 2001. Beginning in October 2002, Medical City replaced the entire roof with a foam roof.

In its fourth amended petition, Medical City alleged that it notified Carlisle and Charley Company of leaks, and Charley Company "attempted to repair" the roof at the request of Medical City and/or Carlisle. Medical City alleged that the leaks were the result of manufacturing defects in the roof, premature deterioration of the roofing materials, and inadequate or insufficient attempts at repair made by both Carlisle and Charley Company. Medical City alleged that, "[a]fter demand was made" by Medical City, Carlisle "failed and refused to continue to honor its [w]arranties, including failing and refusing to cause adequate repairs to or replacement of the roof necessary to stop the roof from leaking in accordance with its [w]ar-

ranties." Moreover, it alleged that, as a result of Carlisle's refusal to honor its warranties and failure of the repairs attempted by Charley Company to stop the roof from leaking, Medical City was forced to have the roof replaced to stop the ongoing leaks. Medical City asserted that it had performed all conditions precedent, or they had been waived. It asserted causes of action for breach of the warranties, breach of implied warranties, and negligence. Medical City sought damages, including the cost of replacing the leaking roof, attorney's fees, pre- and postjudgment interest, and costs of court.

The case was tried before a jury. Carlisle moved for an instructed verdict, which was denied, and made certain objections to the jury charge. The jury found no liability regarding Carlisle's alleged failure to comply with the Carlisle Golden Seal Total Roofing System Warranty and Charley Company's alleged negligence. However, the jury found that: (1) Carlisle failed to comply with the Twenty Year Material Membrane Warranty (hereinafter referred to as the Warranty); (2) its failure to comply was not excused; (3) Medical City, in the exercise of reasonable diligence, should have discovered Carlisle's failure to comply by March 26, 2001; and (4) the Warranty did not limit Medical City's remedies to repair of the roof in the event of a leak, manufacturing defects at the time of the delivery, or premature deterioration of the membrane.[1] The jury awarded Medi-

---

1. The Warranty, provided:

Subject to the following terms and conditions, (SELLER) [Carlisle] warrants to the Buyer that the [Membrane] sold to the Buyer will be free from manufacturing defects at the time of its delivery to the job site.

If upon inspection by the Seller, the membrane evidences manufacturing defects, Seller's liability and Buyer's remedies are limited, at Seller's option, to the repair or replacement of the defective membrane. . . .

Seller further warrants that the Membrane material will not prematurely deteriorate to the point of failure because of weathering for a period of twenty (20) years from the date of sale if properly installed, maintained and used for the purpose for which the Seller intended.

cal City $110,449.59 in damages and $121,277.04 in attorney's fees.

Carlisle filed a motion for judgment notwithstanding the verdict. The court rendered judgment for Medical City on the jury's verdict. Carlisle moved for new trial, which was apparently overruled by operation of law. This appeal followed.

## II. LIMITATIONS

The jury found that "Medical City, in the exercise of reasonable diligence, should have discovered Carlisle's failure to comply with the Twenty Year Membrane Material Warranty" by March 26, 2001. In its second issue, Carlisle contends the trial court erred in denying its motion for instructed verdict which asserted that Medical City's claims were barred as a matter of law by the statute of limitations and that no evidence supports the jury's answer.

### A. Standard of Review and Applicable Law

■ An appeal from the denial of a motion for directed verdict is in essence a challenge to the legal sufficiency of the evidence. *Lochinvar Corp. v. Meyers*, 930 S.W.2d 182, 187–88, (Tex.App.-Dallas 1996, no writ). We sustain challenges to the legal sufficiency of the evidence when: (1) there is a complete lack of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 188 (citing *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990)).

Limitations is an affirmative defense on which Carlisle had the burden of proof. *See* TEX.R. CIV. P. 94 (affirmative defenses include statute of limitations). As an appellant attacking the legal sufficiency of a finding on an issue on which it had the burden of proof, Carlisle must demonstrate on appeal that the evidence conclusively established all vital facts in support of the issue. *See Lochinvar Corp.*, 930 S.W.2d at 188 (citing *Sterner v. Marathon*

Buyer shall give Seller notice of a claim under this warranty within thirty (30) days of discovering the premature deterioration of the Membrane.

If upon inspection by the Seller, the Membrane shows premature deterioration because of weathering within the twenty (20) year period stated herein, Seller's liability and Buyer's remedies are limited at Seller's option to the providing of repair material for the original Membrane or credit to be applied towards the purchase of a new Membrane, the value of these remedies being determined by the Seller based upon the number of remaining months of the unexpired warranty used to pro-rate at the current prices for the Membrane. The maximum pro-rated value allowed by the Seller for repair or credit shall not exceed the original Membrane purchase price.

This warranty refers to the membrane material only. Flashings, adhesives and other accessories contained in a membrane system are not covered by this warrant.

NO REPRESENTATIVE OF THE SELLER HAS AUTHORITY TO MAKE ANY REPRESENTATIONS OR PROMISES EXCEPT AS STATED HEREIN.

THERE ARE NO WARRANTIES EITHER EXPRESSED OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WHICH EXTEND BEYOND THE WARRANTIES CONTAINED IN THIS DOCUMENT. CARLISLE SHALL NOT BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES, INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS OR DAMAGES TO THE STRUCTURE OR ITS CONTENTS ARISING UNDER ANY THEORY OF LAW WHATSOEVER.

*Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989)). In reviewing such a "matter of law" challenge, we must determine whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005).

■ The Uniform Commercial Code applies to transactions in goods. Tex. Bus. & Com.Code Ann. § 2.102 (Vernon 1994); *Safeway Stores, Inc. v. Certainteed Corp.,* 710 S.W.2d 544, 545 (Tex.1986). The Code provides a four-year limitation period for breach of an express warranty. Tex. Bus. & Com.Code Ann. § 2.725(a) (Vernon 1994); *Safeway Stores, Inc.,* 710 S.W.2d at 545. "A breach of warranty occurs when tender of delivery is made, *except* that where a warranty *explicitly* extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." Tex. Bus. & Com.Code Ann. § 2.725(b) (Vernon 1994) (emphasis added). Thus, section 2.725(b) rejects the discovery rule except for warranties explicitly extending to future performance of the goods. *Lochinvar Corp.,* 930 S.W.2d at 188.

■ The section 2.725(b) exception applies when the warranty explicitly relates to the goods' future compliance with some performance standard. *Muss v. Mercedes–Benz of N. Am., Inc.,* 734 S.W.2d 155, 158 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). In contrast, an express warranty to repair or replace for a period of time unrelated to the guaranteed life of the particular product sold does not extend the limitations period. *Pako Corp. v.*

*Thomas,* 855 S.W.2d 215, 220 (Tex.App.-Tyler 1993, no writ). Further,

> [e]xpress warranties that meet the "explicitness" exception of section 2.725(b) may extend to future performance. Courts construe the exception narrowly, with the emphasis on the term "explicitly." [citations omitted] *For an express warranty to meet the exception, it must make specific reference to a specific date in the future.*

*Safeway Stores, Inc.,* 710 S.W.2d at 548 (emphasis added).

**B. Discussion**

■ In the Warranty, Carlisle warranted that the membrane "will not prematurely deteriorate to the point of failure because of weathering for a period of twenty (20) years from the date of sale if properly installed, maintained and used for the purpose for which [Carlisle] intended." This language explicitly warrants that the membrane's performance was assured for twenty years from the date of sale. *See PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 93 (Tex. 2004) ("Because PPG explicitly warranted the Twindows would be free of defects for five years, it falls within [the section 2.725(b) ] exception."). Accordingly, Medical City's breach of the Warranty comes within the section 2.725(b) exception, and Medical City's cause of action accrued, not upon initial delivery, but when a reasonable buyer should have discovered the defect of premature deterioration to the point of failure because of weathering up until the end of the twenty-year warranty period, when the "time of such performance" expired. *See id.*

■ The evidence shows the only communication from Carlisle regarding the Oc-

tober 2000 roof inspection was a December 2000 letter from James Gage, a Carlisle warranty specialist, informing Medical City that he was "seeking Carlisle management approval" for "seam overlay." Carlisle never informed Medical City that any repairs had been approved. On January 5, 2001, Medical City's consultant, LRW, informed Medical City that weathering had caused the premature deterioration of the membrane to the point of failure. There was no evidence that Medical City should have discovered this defect earlier. There was evidence that previous leaks were caused by the seams. In its February 23, 2001 letter to Carlisle, LRW told Carlisle that the pinholes and "carbon black release" were evidence of premature aging of the membrane; the roof system would "not last per your warranty of . . . twenty (20) years"; and LRW recommended replacement, not further attempts at repair. The letter stated:

> We feel that Carlisle is responsible for this replacement and expect a recommendation and remedies from your company no later than March 5, 2001. Your attempt at repairing the system will no longer suffice as an alternative for repair on this roof system. If we do not hear from you by this date I will be advising my client to seek legal remedies from proper counsel.

When Carlisle did not respond, Medical City's counsel wrote a letter to Carlisle on March 29, 2001 stating that the "deterioration and failure of the fully warranted roofing system" and Carlisle's "failure to respond to [its] warranty obligations" was unacceptable and advising Carlisle of its plan to "take those steps necessary to protect its property . . . resulting from the failure of [its] roof system." The letter notified Carlisle that Medical City would "take those steps necessary to protect its property" unless Carlisle responded "immediate[ly]." There is no evidence Carlisle responded. Medical City filed suit on July 20, 2001, well within the twenty-year warranty period. Accordingly, there is some evidence that by March 26, 2001, Medical City, in the exercise of reasonable diligence, should have discovered that Carlisle failed to comply with the Warranty.

Carlisle argues the membrane began to deteriorate in 1991, as evidenced by the leaks, and became more widespread in 1995 or 1996, which should have alerted Medical City to premature deterioration. Carlisle argues that this Court's opinion in *Lambert v. Wansbrough*, 783 S.W.2d 5 (Tex.App.-Dallas 1989, writ denied), addressed this same situation. In *Lambert*, the homeowner sued the contractor asserting that the roof the contractor installed was defective. The warranty in that case provided: "This roof carries a 15 year bond issued by MFG [manufacturer?] in the event of faulty material. And a 15 year guarantee by contractor in the event of faulty workmanship." *Id.* at 6 (brackets in original). When the homeowner began to experience leaks, he notified the contractor, who repaired them. Within four years, the contractor fixed the roof ten times, after which the homeowner hired another contractor who replaced the entire roof. The homeowner sued the contractor six years after the first leak. This Court decided that the defects became apparent during the first year, the clock of limitations began to run, and a suit filed in the sixth year came too late. *Id.* at 7.

In *Lambert*, the contractor warranted against faulty workmanship; that warranty was breached, and the limitations period began to run when the roof leaked, indicating faulty workmanship. Here, the War-

ranty was breached, the cause of action accrued, and limitations began to run when inspection revealed premature deterioration of the membrane to the point of failure because of weathering, and Carlisle failed to respond to LRW's letter, thereby failing to provide any remedy, including repair material or credit for a new membrane. A leak could indicate a problem with workmanship, which was not expressly warranted by Carlisle, or premature deterioration of the membrane to the point of failure because of weathering, which was warranted by Carlisle and revealed by the LRW inspection and report. Accordingly, *Lambert* is distinguishable.

Thus, the record shows that some evidence supports the jury's answer to Question No. 6. Because Medical City filed suit on July 20, 2001, within four years of March 26, 2001, we reject Carlisle's argument that limitations barred this suit. We resolve Carlisle's second issue against it.

### III. NOTICE

In its fifth issue, Carlisle contends the breach of warranty claim was barred as a matter of law by Medical City's failure to satisfy conditions precedent to recovery. Specifically, Carlisle contends that no evidence supports the jury's answer to Question No. 5, which asked whether Carlisle's failure to comply with the Warranty was excused. Question No. 5 included the following instructions:

> Unless Carlisle waived these requirements, failure to comply by Carlisle is "excused": (a) if Medical City failed to provide notice of the premature deterioration of the membrane on the Building B roof to Carlisle within thirty (30) days; or (b) if Medical City unreasonably failed to allow the repairs proposed by Carlisle to be conducted on the Building B roof.

> "Waiver" means an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

Question No. 5 was conditioned on a positive answer to Question No. 4, which asked, "Did Carlisle fail to comply with the terms of the Twenty Year Membrane Material Warranty?" The jury answered yes; Carlisle does not challenge the jury's answer to Question No. 4.

### A. Applicable Law and Standard of Review

■■■■ Failure to comply with a notice requirement contained in a warranty bars any recovery for breach of the warranty. *Lochinvar Corp.*, 930 S.W.2d at 189 (applying section 2.607 of the UCC); *see* Tex. Bus. & Com.Code Ann. § 2.607(c)(1) (Vernon 1994) (providing that, where tender has been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy"). Compliance with a notice requirement is considered a condition precedent to recovery. *U.S. Tire–Tech v. Boeran, B.V.*, 110 S.W.3d 194, 200 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). Medical City had the burden of proving at trial that it complied with the notice provision contained in the Warranty, or that Carlisle waived compliance. *See id.* ("The burden of alleging and proving notice under [section] 2.607(c)(1) is properly placed on the buyer.").

■■■■ A person has "notice" of a fact when: (1) he has actual knowledge of it; (2) he has received a notice or notification of it; or (3) from all the facts and circumstance known to him at the time in question, he has reason to know that it exists. Act of May 25, 1967, 60th Leg., R.S., ch. 785, § 1, sec. 1.201(25), 1967 Tex. Gen.

Laws. 2343, 2350, *amended by* Act of May 22, 2003, 78th Leg., R.S., ch. 542, §§ 1, 21, 2003 Tex. Gen. Laws 1840, 1844 (effective September 1, 2003) (current version at TEX. BUS. & COM.CODE ANN. § 1.202 (Vernon Supp.2005)). Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with that right. *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex.2003) (per curiam).

If an appellant is attacking the legal sufficiency of an adverse finding of an issue on which he did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). To evaluate the legal sufficiency of the evidence to support a finding, we must "determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519 (Tex. 2002) (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994)). We sustain a no-evidence point only if there is no more than a scintilla of evidence proving the elements of the claim. *Id.* at 520 (citing *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex.1999)). In making this determination, we must "view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller*, 168 S.W.3d at 807.

**B. Discussion**

 The Warranty provides that Medical City "shall give [Carlisle] notice of a claim under this warranty within thirty (30) days of discovering the premature deterioration of the [m]embrane." Although Carlisle argues there is no evidence that

Medical City provided notice to Carlisle within thirty days of discovering leaks or that Carlisle waived the notice requirement, the record shows otherwise. Specifically, the director of Medical City's maintenance department, Steven Meier, who was responsible for ensuring the roof was repaired, testified that, when the roof leaked the first time in 1994 or 1995, he contacted Carlisle and was told to contact Charley Company for all repairs, which he did for subsequent leaks. Moreover, Carlisle inspected the roof in October 2000, and there is no evidence that the defects observed by LRW in November 2000 were not present one month earlier. We conclude this evidence supports the jury's finding that Carlisle's failure to comply with the Warranty was not excused because it had notice of the premature deterioration or waived the notice requirement. Accordingly, we resolve Carlisle's fifth issue against it.

## IV. DAMAGES

In its third issue, Carlisle contends that there was no evidence to support the trial court's award of damages. Specifically, Carlisle contends that the only evidence of damages Medical City presented at trial related to the costs incurred in replacing the roof, but the terms of the Warranty expressly disallowed replacements costs and instead limited any remedies to the cost of repair material or a pro-rated credit towards the future purchase of Carlisle membrane material.

Question No. 11 asked what sum of money would fairly and reasonably compensate Medical City for its direct damages, if any, caused by Carlisle's breach of its warranties. This question included the following instruction:

"Direct damages" means those damages which naturally and necessarily flow

from a wrongful act, are so usual an accompaniment of the kind of breach alleged that the mere allegation of the breach gives sufficient notice, and are conclusively presumed to have been foreseen or contemplated by the party as a consequence of his breach.

The jury answered $110,499.59.

Medical City responds that Carlisle's issue on appeal is actually a complaint that the damages finding is based on an incorrect measure of damages, rather than a "no evidence" complaint. Medical City contends that if the Warranty limited Medical City's recovery, then the jury should have been instructed in Question No. 11 to consider only that measure of damages. The instruction in Question No. 11 did not limit the remedies available to Medical City. Medical City contends that, having failed to object to the measure of damages, Carlisle waived the right to complain on appeal that Medical City was limited to the measure of damages in the Warranty.

### A. Applicable Law

█ Rule of civil procedure 274 provides, in pertinent part:

A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.

TEX.R. CIV. P. 274. Absent a specific objection on grounds that the charge submits an improper measure of damages, the error is waived. *Mowery v. Fantastic Homes, Inc.*, 568 S.W.2d 171, 173 (Tex.Civ. App.-Dallas, 1978, no writ); *Am. Transfer & Storage Co. v. Reichley*, 560 S.W.2d 196, 199–200 (Tex.Civ.App.-Amarillo 1977, writ ref'd n.r.e.).

### B. Discussion

█ Carlisle objected to Question No. 11 on the grounds that there was no evidence or legally insufficient evidence to allow for such submission. However, Carlisle did not specifically object to Question No. 11 before submission on grounds that it submitted an improper measure of damages. *See Mowery*, 568 S.W.2d at 173. In its motion for judgment notwithstanding the verdict, Carlisle made the same argument as its issue on appeal. However, Carlisle's post-verdict objection came too late. *See id.* ("If a party is precluded from urging errors in the charge if no distinct objection is made prior to submission, then surely the trial court may not, on its own motion, disregard material issues which have been submitted without a proper objection."). Accordingly, we conclude that Carlisle waived its specific complaint in its third issue, and we need not address it.

## V. ADMISSION OF EVIDENCE

In its fourth issue, Carlisle contends that the trial court reversibly erred by refusing to strike the testimony of James West, Medical City's expert witness who testified regarding the replacement cost of the roof. Carlisle argues that West should not have been allowed to testify about the cost of replacing the roof on Building B because: (1) he was not qualified to give an expert opinion on the replacement value of the roof; (2) his opinions were not probative of the actual measure of damages allowed under the Warranty; and (3) his methodology was based on guesswork, and therefore his opinions were unreliable. At trial, Carlisle objected that West was not

qualified to testify as an expert and his testimony was unreliable. The court overruled the objection as to "the computations."

### A. Standard of Review

■■■ The admission of expert testimony is reviewed under the abuse of discretion standard. *Guadalupe–Blanco River Auth. v. Kraft,* 77 S.W.3d 805, 807 (Tex.2002). A trial court abuses its discretion when it acts without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

### B. Expert Qualification

#### 1. Applicable Law

■■■■ "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex.R. Evid. 702. The party offering the expert's testimony bears the burden to prove that the witness is qualified under rule 702. *Broders v. Heise,* 924 S.W.2d 148, 151 (Tex.1996). The offering party must demonstrate that the witness possesses special knowledge as to the very matter on which he proposes to give an opinion. *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718 (Tex.1998).

#### 2. Discussion

■■■ West testified the he was a licensed commercial property adjuster for at least fourteen years, with experience inspecting buildings and writing and reviewing estimates of damages to commercial buildings, including roofs. In his career, he had inspected about 250 commercial roofs, of which about 30 were rubber or EPDM roofs, and he had written over 225 roof repair or replacement estimates. He used the "RS Means Manual," estimating software, and his own experience. Carlisle argues that West was not qualified because he had never prepared specifications for a new roof or a re-roof or monitored the installation of a foam roof. However, those arguments relate to installation of a roof, not to West's qualifications to testify as to the cost of the installation of the foam roof. We conclude that because Medical City carried its burden to show that West was qualified to testify to the replacement cost of the new foam roof, the trial court did not abuse its discretion in determining he was qualified to give an expert opinion on this issue. *See Broders,* 924 S.W.2d at 151.

### C. Reliability and Relevance

#### 1. Applicable Law

■■■ To be admissible, evidence must be both relevant to the issues in the case and based upon a reliable foundation. *Gammill,* 972 S.W.2d at 720 (citing *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995)). Relevant testimony is that which is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Robinson,* 923 S.W.2d at 556. In addition, all expert testimony must be based on a reliable foundation. *Gammill,* 972 S.W.2d at 726; *Robinson,* 923 S.W.2d at 556. Whether an expert's testimony is based on scientific, technical, or other specialized knowledge, the trial court must evaluate the methods, analysis, and principles relied upon in reaching the opinion. *Gammill,* 972 S.W.2d at 725.

#### 2. Discussion

Carlisle's argument that West's testimony was irrelevant is based on its assertion that the cost of replacing the EPDM roof was not a proper measure of damages because, under the terms of the Warranty, damages were limited to providing repair material or credit for purchase of a new membrane. Because we have already concluded that Carlisle waived its issue as to the measure of damages, any error in admitting West's testimony as irrelevant to the measure of damages could not have caused the rendition of an improper judgment and was, therefore, harmless. *See* Tex.R.App. P. 44.1(a)(1).

■■■ Carlisle's argument that West's testimony was unreliable relates to West's methodology. Carlisle argues that West's estimates were guesswork because his source for estimates, the "RS Means Manual," did not contain information specific to EPDM roof removal. Thus, according to Carlisle, West's opinions on the replacement costs were a result of his "subjective interpretations," not a verifiable theory.

West testified that the bids for the cost of replacing the roof that Medical City received were reasonable because he performed his own estimate "to test the numbers" that Medical City received in its bids. His cost estimate was $257,644. He arrived at that figure by consulting the "RS Means Facilities Construction Cost Data" guide (the "RS Means Manual"), which he testified is used widely "in the industry" by contractors and insurance companies to check the costs of materials and installation charges to make estimates. The estimate shows that the removal costs were based on an estimate of a "BUR" roof removal because the "RS Means Manual" did not include the costs of removal of an EPDM roof. West also used his own experience. The cost of removing the

EPDM roof and replacing it with a foam roof was $232,742.

We conclude that the methods, analysis, and principles on which West based his "computation" testimony shows that testimony rested on a reliable foundation. Even the estimate of the EPDM removal is based on an objective measure, not West's "guesswork." Accordingly, we reject Carlisle's argument that West's testimony was unreliable.

Having rejected Carlisle's arguments regarding the inadmissibility of West's testimony as to the cost of the roof replacement, we conclude the trial court did not abuse its discretion it admitting it. We resolve Carlisle's fourth issue against it.

## VI. ATTORNEY'S FEES

In its first issue, Carlisle contends the trial court erred in awarding attorney's fees to Medical City. Question 12 asked the jury to find reasonable attorney's fees; the jury answered "$121,277.04" "[f]or preparation and trial of Medical City's breach of express or implied warranty causes of action against Carlisle." Question 12 was premised on an affirmative answer to Question 11, which addressed direct damages "caused by Carlisle's breach of its warranties[.]" Carlisle moved for judgment notwithstanding the verdict on the grounds that attorney's fees were not recoverable for a breach of warranty claim as a matter of law. The trial court denied Carlisle's motion and awarded Medical City the attorney's fees found by the jury. On appeal, Carlisle argues that attorney's fees are not recoverable in a breach of warranty action as a matter of law pursuant to section 38.001(8) of the civil practice and remedies code.

### A. Standard of Review and Applicable Law

■■■ Whether a party is entitled to recover attorney's fees is a question of law

for a court to determine. *Holland v. Wal–Mart Stores,* 1 S.W.3d 91, 95 (Tex.1999) (per curiam). A party may recover attorney's fees pursuant to the express terms of a contract or a statute authorizing such an award. *Harris Packaging Corp. v. Baker Concrete Constr. Co.,* 982 S.W.2d 62, 69 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). In its fourth amended petition, Medical City alleged it was entitled to attorney's fees pursuant to chapter 38 of the civil practice and remedies code, which provides that a party "may recover attorney's fees from an individual or corporation ... if the claim is for ... an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 1997). Chapter 38 "shall be liberally construed to promote its underlying purposes." *Id.* § 38.005 (Vernon 1997). A party cannot recover attorney's fees under a breach of express warranty claim pursuant to section 38.001(8) because it is distinct from a breach of contract claim. *Harris Packaging Corp.,* 982 S.W.2d at 69 (citing *Southwestern Bell Tel. Co. v. FDP Corp.,* 811 S.W.2d 572, 576 (Tex.1991)); *see JHC Ventures, L.P. v. Fast Trucking, Inc.,* 94 S.W.3d 762, 769 (Tex.App.-San Antonio 2002, no pet.) (adopting conclusion in *Harris Packaging Corp.*).

In *Southwestern Bell Telephone Co.,* the issue before the court was whether the cause of action, Southwestern Bell's failure to include a display in FDP Corporation's Yellow Pages advertisement as agreed, was a breach of warranty, which was actionable under the DTPA, or a breach of contract. *Sw. Bell Tel. Co.,* 811 S.W.2d at 573. Bell argued that its salesman's statements that the advertisement would be published correctly "at most constitute[d] a promise to perform in the future, not a guarantee of performance," and thus FDP's only claim was for breach of con-

tract, not breach of warranty. *Id.* at 574. FDP countered that "a promise to perform an act in the future can be a warranty just like any other promise or affirmation." *Id.*

■ The Texas Supreme Court reviewed the history of the development of express warranties in the context of sale of goods, culminating with the UCC, which codified the common law of warranty. *See id.* at 574–76. Clearly, an express warranty originated with the requirement that sellers "rectify any defect in the goods they sold, even if the sellers were unaware of the defect when they sold them." *Id.* at 575. The court stated, "The UCC recognizes that breach of contract and breach of warranty are not the same cause of action." *Id.* at 576. Specifically, the court noted that the remedies for breach of contract are set forth in section 2.711 and are available to a buyer "[w]here the seller fails to make delivery." *Id.* (quoting TEX. BUS. & COM.CODE ANN. § 2.711(a) (Vernon 1994)). "The remedies for breach of warranty, however, are set forth in section 2.714, and are available to a buyer who has finally accepted goods, but discovers that the goods are defective in some manner." *Id.* (citing TEX. BUS. & COM.CODE ANN. §§ 2.714, 2.711 cmt. 1 (Vernon 1994)). In light of this distinction between contract and warranty, the court held that Bell's omission of the display was a defect in the performance of its advertising contract, constituting a breach of its warranty to publish the advertising correctly. *Id.*

## B. Discussion

Medical City pleaded that it and Charley Company agreed to the installation of a new roof and that, "[a]t the close of the project and also as required by the Agreement [with Charley Company] Carlisle issued various warranties" to Medical City.

Medical City pleaded further that Carlisle "failed and refused to continue to honor its [w]arranties, including failing and refusing to cause repairs to or replacement of the roof ... in accordance with its [w]arranties." Medical City did not assert specifically a breach of contract cause of action, nor does it argue that it asserted such a claim against Carlisle at trial. None of the liability questions addressed a breach of contract claim, and Medical City did not request any questions or instructions on a breach of contract claim. The attorney's fees question referred specifically to breach of warranty. We conclude that the basis of the jury's verdict and the judgment as to liability and damages was breach of warranty. Because attorney's fees are not recoverable for a successful breach of warranty claim, the only basis on which Medical City sought and recovered attorney's fees, the trial court erred in awarding attorney's fees to Medical City. *See Harris Packaging,* 982 S.W.2d at 69.

### 1. Nature of Medical City's claims: both warranty and contract?

Nevertheless, Medical City argues it was entitled to attorney's fees because its claims sounded in both warranty and contract, "to the extent the two are different." Specifically, Medical City argues that the Warranty encompassed both expressions of warranty and contract promises: (1) Carlisle's promise that the membrane would be free from manufacturing defects when it was delivered to the job site was a warranty because it referred to the quality of the goods; and (2) Carlisle's promise (i) to repair or replace any membrane containing manufacturing defects, and (ii) to provide repair material or credit toward the purchase of a new membrane if the membrane showed premature deterioration during the twenty-year warranty peri-

od were contract promises because they referred to delivery of future performance. We disagree. Carlisle's promises to repair or replace defective material and to provide a credit toward purchase of a new membrane replacing a prematurely deteriorated membrane were promises to perform acts in the future related to a defect in the performance of the goods, which is a warranty. These promises did not relate to the delivery of goods. Therefore, we reject Medical City's argument that its claim that Carlisle failed to perform in the future sounded in both warranty and contract. *See id.*

### 2. Breach of warranty as a "function of contract"

Medical City also argues that, to the extent its claims sound in warranty, it is entitled to attorney's fees pursuant to section 38.001(8) because express warranties are a function of contract pursuant to Texas law. Medical City quotes *Coca Cola Bottling Co. v. Enas,* 164 S.W.2d 855, 857 (Tex.Civ.App.-Amarillo 1942, writ ref'd w.o.m.), to support its argument regarding the contractual nature of a warranty: "[I]t is established law that no warranty, whether expressed or implied, can be created except by, or as the result of, a contract." *Enas* relied on a statement from *Coca-Cola Bottling Co. of Fort Worth v. Smith,* 97 S.W.2d 761, 766 (Tex.Civ.App.-Fort Worth 1936, no writ), in which the court said, "We recognize the universal rule that a warranty, either express or implied, must grow out of contractual relations between the parties."

However, comment 2 of section 2.313 of the UCC, which provides for the creation of express warranties by the seller, expressly states: "Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer

as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract." TEX. BUS. & COM.CODE ANN. § 2.313 cmt. 2 (Vernon 1994); *see Indust–Ri–Chem Laboratory, Inc. v. Par–Pak Co.,* 602 S.W.2d 282, 287–88 (Tex.Civ.App.-Dallas 1980, no writ) (express warranties pass with goods, even when no privity exists between remote manufacturer and buyer). Accordingly, we reject Medical City's argument that attorney's fees are available under section 38.001(8) for breach of express warranty because of its "contractual nature."

### 3. Authority of *Harris Packaging Corp.*

Lastly, Medical City argues that we should not rely on *Harris Packaging Corp.* First, Medical City argues that case involved a "warranty of condition," not a breach of a promise of future performance. Because we have already concluded that Carlisle's promise of future performance here was a warranty, we are not persuaded to reject the holding of *Harris Packaging Corp.*

Second, Medical City argues that *Harris Packaging Corp.* conflicts with statements in *PPG Industries, Inc.* and this Court's opinion in *Kuiper v. Wright,* No. 05–99–00689–CV, 2001 WL 923367 (Tex.App.-Dallas Aug., 16, 2001, no pet.) (not designated for publication).

In reaching its conclusion that attorney's fees are not recoverable on an express warranty claim, *Harris Packaging Corp.* relied on the specific allowance for attorney's fees in the DTPA for express warranty claims if brought under that statute.

*See Harris Packaging Corp.,* 982 S.W.2d at 69. The Houston First Court of Appeals reasoned, "This demonstrates the legislature's intent to disallow attorney's fees for [the express warranty] claim; this provision would be meaningless if one could receive attorney's fees without it." *Id.* Medical City argues that this statement conflicts with the statement in *PPG Industries, Inc.* that "[e]conomic damages and attorney's fees ... were recoverable in contract and warranty long before the DTPA was passed." *PPG Indus., Inc.,* 146 S.W.3d at 89. However, this statement is not at odds with *Harris Packaging, Corp.* because the supreme court's statement encompasses more than express warranty. Moreover, the supreme court was discussing the assignability of DTPA claims, making its statement regarding attorney's fees dictum.

Medical City also contends the statement is *Harris Packaging Corp.* is at odds with this Court's statement in *Kuiper,* No. 05–99–00689–CV, 2001 WL 923367, at *9, that "[p]ursuant to Texas law, the prevailing party on breach of contract, breach of warranty, and DTPA claims is entitled to reasonable attorneys' fees," citing section 38.001 and section 17.50(d) of the DTPA. However, this sentence does not conflict with *Harris Packaging Corp.* because section 38.001 encompasses breach of contract claims, and the opinion shows a breach of warranty theory was pleaded under the DTPA. *See id.* at *6–7. Accordingly, the statement in *Kuiper* is dictum as to attorney's fees for breach of warranty.

Medical City requested attorney's fees pursuant to section 38.001, but it did not plead or try a breach of contract cause of action and did not recover on that theory. We have rejected Medical City's arguments that section 38.001(8) encompasses

breach of express warranty claims. Accordingly, we resolve Carlisle's first issue in its favor.

## VII. CONCLUSION

Because of our disposition of Carlisle's issues, we reverse the trial court's award of attorney's fees to Medical City and render judgment that Medical City take nothing on that claim. In all other respects, we affirm the trial court's judgment.