# IN THE SUPREME COURT OF TEXAS

No. 17-0578

BOMBARDIER AEROSPACE CORPORATION, PETITIONER,

v.

SPEP AIRCRAFT HOLDINGS, LLC; PE 300 LEASING, LLC; SARACEN PURE
ENERGY PARTNERS, LP; CRANE CAPITAL GROUP, INC.; JAMES R. CRANE;
FLORIDIAN GOLF RESORT, LLC; CHAMPION ENERGY MARKETING, LLC; AND
CRANE WORLDWIDE LOGISTICS, LLC, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

**Argued November 1, 2018**

JUSTICE GREEN delivered the opinion of the Court.

In this case, we must determine whether: (1) the court of appeals erred in determining that the evidence was legally sufficient to support the trial court's award of both actual and punitive damages to all plaintiffs; and (2) the limitation-of-liability clauses in the parties' agreements barred the punitive damages award, or alternatively, whether the punitive damages award was unconstitutionally excessive. We hold that the plaintiffs' appraisal expert's testimony was not conclusory, and therefore the court of appeals did not err in holding that the evidence was legally sufficient to support the award of actual damages to all plaintiffs. However, we hold that the limitation-of-liability clauses in the parties' agreements barred the punitive damages award. In light

of this holding, we do not reach the issue of whether the punitive damages were excessive. Therefore, we affirm in part and reverse in part the court of appeals' judgment.

## I. Background

The plaintiffs—SPEP Aircraft Holdings, LLC (SPEP), PE 300 Leasing, LLC (PE), Saracen Pure Energy Partners, LP, Crane Capital Group, Inc., James R. Crane, Floridian Golf Resort, LLC, Champion Energy Marketing, LLC, and Crane Worldwide Logistics, LLC[1]—filed suit against the defendant, Bombardier Aerospace Corporation, for breach of contract, breach of express warranty, and fraud.[2] In 2010, Jim Crane and Neil Kelley purchased a Challenger 300 aircraft from Bombardier for $19,850,000 through the purchasing companies, SPEP and PE.[3] In the purchase negotiations, Crane and Kelley specified that they were agreeing to purchase a new aircraft.[4] Bombardier and the purchasing companies entered into purchase and management agreements through Bombardier's subsidiary, Flexjet.[5] The purchase agreement expressly provided: "Flexjet will not be liable to either customer for any indirect, special, consequential damages or punitive damages arising out of any lack or loss of use of any aircraft, equipment, spare parts, maintenance,

---

[1] We refer to plaintiffs Saracen Pure Energy Partners, LP, Crane Capital Group, Inc., James R. Crane, Floridian Golf Resort, LLC, Champion Energy Marketing, LLC, and Crane Worldwide Logistics, LLC, collectively as the "non-purchasing parties" or "non-purchasers."

[2] The plaintiffs nonsuited the breach-of-warranty claim.

[3] For purposes of purchasing the aircraft, Neil Kelley formed and managed SPEP, and James Crane formed and managed PE. SPEP and PE each purchased a 50% undivided ownership interest in the aircraft.

[4] The purchase agreement never clearly indicates that the Challenger 300 was new. The Certificates of Airworthiness for the engines, however, indicate that the engines were new.

[5] Flexjet was a Bombardier corporation at the time of purchase. Bombardier manufactured the aircraft, and Flexjet was paid approximately $70,000 per month to manage the aircraft. Flexjet and Bombardier are referenced collectively in this opinion as the defendant or Bombardier.

repair or services rendered or delivered under this purchase agreement." Under the purchase agreement, Flexjet required SPEP and PE to provide it with a power of attorney for acceptance and registration over the aircraft. This gave Bombardier the exclusive power over inspection and acceptance of the Challenger 300 on SPEP's and PE's behalf. For this reason, SPEP and PE did not hire a third party to inspect their new Challenger 300, believing that "a new airplane . . . wouldn't . . . require an inspection" and that Bombardier was responsible for inspecting it. In the management agreement, Flexjet agreed to "manage and maintain the aircraft with reasonable care in accordance with applicable insurance coverage and within the standards and guidelines established by the [Federal Aviation Administration (FAA)] and [to] comply with all laws, ordinances or regulations relating to the use, operation and maintenance of the aircraft." Flexjet also promised in the management agreement to "maintain . . . all records, logs and other materials" required by the FAA and to "provide professionally trained and qualified pilots" to operate the Challenger 300. The management agreement also contained a limitation-of-liability clause similar to that in the purchase agreement. The clause provided: "Neither party hereto may be held liable to the other party for any indirect, special or consequential damages and/or punitive damages for any reason, including delay or failure to furnish the aircraft or by the performance or non-performance of any management services covered by this Management Agreement."

Due to dissatisfaction with the management services, SPEP and PE eventually canceled Flexjet's management of the Challenger 300. The Challenger 300 contained two main engines (left and right) manufactured by Honeywell in 2008. SPEP and PE's inspection of the Challenger 300's logbooks revealed that the left engine had been repaired for an interstage turbine temperature (ITT)

3

split, which occurs when there is a difference in ITT between the engines. Further, the left and right engines had each been installed and removed multiple times on at least two other aircraft. According to Flexjet's Quality Assurance Programs Administrator, Wayne Banker, the left engine had also previously been repaired for water contamination and oil-wetted cavities. Banker and his supervisors knew about the left engine's history, and he knew that the Challenger 300 had "repaired engines," not new engines. Bombardier never told SPEP or PE about this engine history. One of Flexjet's pilots, Ryan Shifflett, noticed the ITT split during the Challenger 300's initial flight, and he informed the aircraft's Corporate Aircraft Logistics Manager, who then informed the Vice President of Sales—all of whom believed SPEP and PE should be made aware of the engine history. Ultimately, however, Bombardier's Director of Operations and Vice President of Operations told the Bombardier employees that the engine history was not their concern and that they were not to tell SPEP, PE, Crane, or Kelley about it.

Each engine had a warranty from Honeywell. The warranty for each engine provides: "This warranty shall expire seventy-eight (78) months from the date of shipment by Honeywell or sixty (60) months following interior completion and entry into service or three thousand (3000) Engine operating hours whichever occurs first." The FAA issued the left engine's Certificate of Airworthiness, a certificate certifying that the aircraft has been examined and is in compliance with federal rules, on August 12, 2008. The FAA issued the right engine's Certificate of Airworthiness on September 17, 2008. The Challenger 300 was not delivered to the purchasing parties, however, until December 6, 2010, years after each engine had previously been installed on other aircraft. The FAA then issued the Challenger 300's Standard Airworthiness Certificate on December 17, 2010.

4

The parties dispute when the engine warranties began—either when the FAA issued the first Certificates of Airworthiness in 2008 (giving SPEP and PE a three-year warranty to each engine from 2010 when they purchased the Challenger 300, ending in 2013), or when the engines were installed on the Challenger 300 in 2010 (giving SPEP and PE a five-year warranty to each engine, ending in 2015). The purchasing parties believed they purchased new engines that would each come with a five-year warranty ending in 2015. An email from a Honeywell representative explained that both engines' warranties ended in September 2013 due to their engine delivery dates of September 17, 2008. Honeywell's position at trial, however, was that Honeywell had extended the warranties to December 2015, using the December 2010 acquisition date as the starting point.

The plaintiffs filed suit against Bombardier and tendered Delvin Fogg, a certified aircraft appraiser, as their expert at trial to testify to the diminution in value of the Challenger 300 in light of the non-disclosures—that is, he testified as to the price that SPEP and PE should have paid for the Challenger 300 and the damages as a result of the higher purchase price. Bombardier retained Kenneth Dufour as its own expert to provide an appraisal of the Challenger 300 at the time of purchase, assuming the aircraft was new when purchased. The jury found in favor of the plaintiffs on both the breach of contract and fraud claims. Under the doctrine of election of remedies, the plaintiffs elected to recover on the fraud claim. Therefore, the plaintiffs were able to recover exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE § 41.003. The jury awarded $2,694,160 in actual damages for fraud and $5,388,320 in exemplary damages. The parties stipulated at trial, and the judgment reflected, that only SPEP and PE were entitled to recover damages.

Bombardier appealed, arguing that: (1) the trial court erred in rendering judgment on the fraud claim because Bombardier did not owe a duty to the plaintiffs; (2) the evidence was legally insufficient to support the fraud finding; (3) there was no evidence that Bombardier committed fraud against all eight plaintiffs; (4) there was legally insufficient evidence to support the actual damages award, and the exemplary damages award should thus be vacated or reduced; and (5) the exemplary damages award was barred by the parties' limitation-of-liabilities clauses. ___ S.W.3d ___, ___ (Tex. App.—Dallas 2017, pet. granted) (mem. op.). The court of appeals affirmed the trial court's judgment. *Id.* at ___. Bombardier filed a petition for review in this Court, which we granted. 61 Tex. Sup. Ct. J. 1849 (Aug. 31, 2018).

## II. Actual Damages

### A. Damages Awarded to Non-Purchasing Parties

Bombardier first asserts that the court of appeals erroneously upheld the award of actual damages as to all eight plaintiffs without requiring each of them to prove fraud. Specifically, Bombardier argues that there was no legal or evidentiary basis on which to uphold the jury's finding that Bombardier committed fraud against each of the eight plaintiffs because the plaintiffs only presented evidence of fraud as to SPEP and PE, the purchasing parties, at trial and not the other six plaintiffs, the non-purchasers. We disagree.

Fraud by non-disclosure, a subcategory of fraud, occurs when a party has a duty to disclose certain information and fails to disclose it. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). To establish fraud by non-disclosure, the plaintiff must show: (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to

6

the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the non-disclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury. *See Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex. 2001) (explaining that there must be a duty to disclose); *Wise v. SR Dall.*, *LLC*, 436 S.W.3d 402, 409 (Tex. App.—Dallas 2014, no pet.) (listing the elements for fraud by non-disclosure (citing *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 507 n.27 (Tex. App.—Houston [14th Dist.] 2007, pet. denied))). In general, there is no duty to disclose without evidence of a confidential or fiduciary relationship. *Ins. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). A fiduciary duty arises "as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships." *Id.* (citations omitted). A confidential relationship is one in which the "parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest." *Id.*; *see also Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) (per curiam) (recognizing that an informal relationship giving rise to a duty may also be created by a "special relationship of trust and confidence [which] exist[s] prior to, and apart from, the agreement" (citation omitted)). An informal relationship giving rise to a duty may also be formed from "a moral, social, domestic or purely personal relationship of trust and confidence." *Meyer*, 167 S.W.3d at 331 (citation omitted). There may also be a duty to disclose when the defendant: (1) discovered new information that made its earlier representation untrue or misleading; (2) made a partial disclosure that created a false impression; or (3) voluntarily disclosed some information, creating a duty to disclose the whole truth. *See, e.g.*, *BP Am. Prod. Co. v. Marshall,* 288 S.W.3d 430, 444–46 (Tex. App.—San

7

Antonio 2008), *rev'd on other grounds*, 342 S.W.3d 59 (Tex. 2011); *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners*, 237 S.W.3d 379, 385–87 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Lesikar v. Rappeport*, 33 S.W.3d 282, 299 (Tex. App.—Texarkana 2000, pet. denied).

Bombardier argues that it owed no duty to disclose to the non-purchasers and that there is no evidence the non-purchasers suffered any injury.[6]  Bombardier further argues that the reviewing court must consider the evidence in light of the jury charge as submitted because there was no objection to the charge's definition of "plaintiffs" as including all eight plaintiffs rather than the two entitled to recover pursuant to the parties' agreement.  *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 112 (Tex. 2009) ("Because there was no objection to the charge as submitted, we assume, without deciding, that the instruction was correct and measure the evidence by the charge as given.").  Bombardier does not, however, dispute the jury's finding that it committed fraud against SPEP and PE, and therefore we do not address that here.  Instead, we consider whether any error from the definition of "plaintiffs" in the jury charge led to any error in the judgment awarding actual damages to the non-purchasers.

The jury charge defined "[p]laintiffs" as "SPEP Aircraft Holdings, LLC, PE 300 Leasing, LLC, Saracen Pure Energy Partners LP, Crane Capital Group, Inc., James R. Crane, Floridian Golf Resort, LLC, Champion Energy Marketing, LLC and Crane Worldwide Logistics, LLC."  The charge defined "[d]efendant" as "FlexJet/Bombardier Aerospace Corporation."  First, the jury found that Bombardier failed to comply with the purchase and management agreements.  Then, when asked

---

[6] Bombardier does not seem to dispute that it owed a duty of disclosure to SPEP and PE, nor does it specifically dispute that SPEP and PE suffered an injury due to its non-disclosure.  Instead, it disputes these elements only as to the non-purchasers.

8

whether "FlexJet/Bombardier commit[ted] fraud against Plaintiffs by failing to disclose or [by] concealing a material fact," the jury answered "yes" and awarded damages accordingly.

It is well-settled, as Bombardier points out, that plaintiffs have the burden of proof to establish their case by a preponderance of the evidence. *See, e.g.*, *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 728 (Tex. 1997); *Boswell v. Pannell*, 180 S.W. 593, 595 (Tex. 1915) (holding that "[t]he burden of proof . . . is upon the plaintiff throughout the trial to establish by a preponderance of the evidence the affirmative of the issue or issues upon which he relies for a recovery"). And we do not disagree that a "prerequisite to recovery of damages is the establishment of liability." *Huddleston v. Pace*, 790 S.W.2d 47, 52 (Tex. App.—San Antonio 1990, writ denied). Although the jury charge defined "plaintiffs" to include the non-purchasing parties, Bombardier did not object to the definition in the trial court and on appeal has not challenged the jury charge on that basis. Further, the parties stipulated at trial that "in the event that there [was] a judgment, that said judgment may be, on behalf of all the plaintiffs, may be made payable 50 percent of whatever that final number is to SPEP Aircraft Holdings, LLC, and 50 percent to PE 300 Leasing, LLC, or as such other agreement that the parties may come up with." Bombardier affirmatively agreed with this stipulation. In fact, Bombardier agreed that the purpose of this stipulation was to make sure the jury charge would "have a one-line answer on the damages questions." The trial court's judgment referenced this stipulation, stating that "the judgment may be satisfied as to all Plaintiffs by paying 50% of the judgment to SPEP Aircraft Holdings, LLC and 50% to PE 300 [L]easing, LLC."

No one disputes that only the two purchasing entities—SPEP and PE—can recover. Analyzing the sufficiency of the evidence under the jury charge, which asks whether Bombardier

9

committed fraud against "plaintiffs," does not change that only SPEP and PE can recover damages and the non-purchasers can neither recover damages nor enforce the judgment. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 299 S.W.3d at 112 (measuring the evidence by the charge as given). Thus, a verdict that the defendant committed fraud against eight plaintiffs when only two plaintiffs can recover does not run afoul of the principle that the plaintiff has the burden to prove its case by a preponderance of the evidence or the principle that a finding of liability is a prerequisite to a damages award. *See Boswell*, 180 S.W. at 595; *Huddleston*, 790 S.W.2d at 52. Because only SPEP and PE could recover damages, the liability findings in favor of the non-purchasers may simply be disregarded. Accordingly, any error in the charge's definition of "plaintiffs" is harmless because the judgment awarded damages only to the purchasing parties pursuant to the parties' stipulation. *Cf. Thota v. Young*, 366 S.W.3d 678, 693 (Tex. 2012) (reasoning that a charge error is not harmless if it "probably caused the rendition of an improper judgment"). The trial court's judgment awarding actual damages to eight plaintiffs, but providing for recovery by only two, is not improper on this basis.

Moreover, in the fraud context, we have never required each plaintiff to prove fraud separately when no plaintiff claims damages in a separate amount and the jury finds one sum of damages for fraudulent conduct. It follows, then, that one fraud injury to both the purchasing and non-purchasing parties for the diminution in value of an aircraft can be remedied by a single damages award to be satisfied by payment to the recovering plaintiffs—here, the purchasing parties.[7]

---

[7] This is especially true in light of the fact that Bombardier agreed to streamline the damages question with a one-line damages answer by stipulating that only SPEP and PE may recover. Moreover, the jury verdict cannot be considered inflated, as Bombardier asserts, merely because fraud was found as to all eight plaintiffs. The jury awarded

10

*See generally* TEX. R. CIV. P. 40 (authorizing the joinder of multiple plaintiffs in one action to assert a right to relief jointly); TEX. R. CIV. P. 48 (standing for the principle that there is one recovery for one injury, even if collective). *See also Playboy Enters., Inc. v. Editorial Caballero*, *S.A. DE C.V.*, 202 S.W.3d 250, 268–69 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied) (utilizing this Court's rule in *Mullen v. Roberts*, 423 S.W.2d 576, 579 (Tex. 1968)—that the judgment should not be for an aggregate sum but should be segregated to each plaintiff if several plaintiffs join in an action where their causes of action are separate and distinct—to hold that the trial court did not abuse its discretion in not charging damages to plaintiffs separately because the plaintiffs did not claim damages in separate sums, but rather asserted a right to relief jointly). Because Bombardier agreed to the jury charge and stipulated that only the purchasing parties could recover damages, and because Bombardier does not dispute the fraud finding against the purchasing parties in this Court, we hold that Bombardier waived any complaint about the definition of "plaintiffs" in the jury charge and that any error in upholding the damages award to all plaintiffs is harmless. We do not reach the question of whether Bombardier owed a duty of disclosure to the non-purchasers.

### B. Damages Amount

In light of the above holding, we next review the evidence to determine whether the plaintiffs presented legally sufficient evidence to support the jury's actual damages award of $2,694,160. Although Bombardier raises a legal sufficiency challenge, it specifically raises the issue of whether the plaintiffs' appraisal expert, Delvin Fogg, presented conclusory testimony as to the valuation of

---

damages based on the diminution in value to the Challenger 300, not based on specific damages to each plaintiff, as none were alleged.

11

the Challenger 300. Specifically, Bombardier argues that the $2,694,160 in fraud damages that the jury awarded is based solely on Fogg's unsupported opinion that the Challenger 300 sustained a 10% diminution in value due to its engine history and that the plaintiffs sustained $709,160 in damages due to the warranty discrepancy.[8] As such, we review whether Fogg's testimony was conclusory such that it could not support the jury's verdict. *See Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 159 (Tex. 2012) (holding that the expert or property owner must provide the factual basis for the property's valuation).

This Court has said that "conclusory testimony cannot support a judgment" because it is considered no evidence. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) (reasoning that "if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence"); *see also Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)));. An expert's testimony is conclusory when the expert asserts a conclusion with no basis. *See Pollock*, 284 S.W.3d at 818; *see also Justiss*, 397 S.W.3d at 159 (concluding that property valuations may not be based on the owner's or the expert's *ipse dixit*—that is, they "may not simply echo the phrase 'market value' and state a number to substantiate [the] diminished value claim; [the expert] must provide the factual basis on which his opinion rests").

---

[8] Bombardier also argues that the court of appeals created a new exception for expert testimony on aircraft valuation. Because Fogg was the plaintiffs' appraisal expert, we consider this argument in the context of the legal sufficiency of Fogg's testimony.

The expert must link his conclusions to the facts, explaining the basis of his assertions. *See Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999) (holding the expert's affidavit conclusory when it failed to provide an explanation linking the expert's conclusions to the facts); *see also Coastal Transp. Co., v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) ("[I]t is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law." (quoting *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999))). Asking the jury to take the expert's word for it because of his status as an expert will not suffice. *See Pollock*, 284 S.W.3d at 816; *Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008).

A party may challenge an expert's testimony as conclusory, making a no-evidence challenge, even when the party did not object to its admissibility at trial. *See Pollock*, 284 S.W.3d at 816. If the jury must guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge. *See City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005). If reasonable and fair-minded people would differ in their conclusions based on the trial evidence, then jurors may also. *See id.* at 822. And if the evidence falls within this zone of reasonable disagreement, a court may not substitute its judgment for the jury's. *See id.* We consider the evidence in the light most favorable to the verdict, indulging every reasonable inference in support of the verdict. *See id.* In determining whether the testimony Fogg presented to the jury was conclusory, we consider the face of the record, which includes his testimony to the jury and his appraisal report. *See Pollock*, 284 S.W.3d at 824 (explaining that the review of the testimony is restricted to the face of the record). *See generally Jafar v. Mohammed*, No. 14-14-00512-CV, 2016

WL 1455978, at *5 (Tex. App.—Houston [14th Dist] Apr. 12, 2016, no pet.) (mem. op.) (utilizing both the expert's testimony and appraisal report in determining whether the expert's testimony was reliable); *Harris Cty. Appraisal Dist. v. Riverway Holdings, L.P.*, No. 14-09-00786-CV, 2011 WL 529466, at *6–9 (Tex. App.—Houston [14th Dist.] Feb. 15, 2011, pet. denied) (mem. op.) (utilizing both the expert's sworn affidavit and expert report in determining whether the expert presented sufficient evidence to support his property valuation).

Fogg is a well-qualified aircraft appraiser who has appraised and inspected thousands of aircraft. He testified about his appraisal of the Challenger 300 in light of the undisclosed information about its engines. Fogg testified that he developed his appraisal of the Challenger 300 using: (1) depositions of Bombardier employees who dealt with the aircraft, such as Wayne Banker and Ryan Shifflett; (2) the aircraft marketplace; (3) his fifty-two years of experience dealing with aircraft, fifteen years of aircraft appraisal experience, and his experience as a buyer's and seller's agent of aircraft; (4) an inspection of all the relevant documentation of the aircraft, including the logbooks; and (5) information from Honeywell and Bombardier, such as reports and memos concerning the aircraft and warranties.[9]

Fogg began his testimony by explaining to the jury the procedure for appraising an aircraft. He explained that the appraisal standards for aircraft inspection require "a physical, hands-on inspection," which is an "inspection of an aircraft and its records." Fogg first conducts an inventory of the aircraft's records. He explained that there must be a "continuous chain of the records," and

---

[9] Fogg also based his testimony at trial on his expert report and supplemental expert report, which were not admitted into evidence. His appraisal report, however, was admitted into evidence.

14

"if any of them are missing, it affects the value." Then, he conducts a physical examination of the entirety of the aircraft, matching serial numbers of the plane parts to the whole plane, inspecting the paint on the plane, looking for corrosion and signs of damage or repairs, and inspecting the interior. He bases these physical inspections on his fifty-two years of experience around aircraft. Fogg next analyzes the logbooks, starting from the date the aircraft was manufactured. Fogg explained that engines have their own logbooks and each needs to be inspected. Additionally, he inspects all the aircraft manuals, the equipment, any wiring diagrams, technical logs, and aircraft flight logs.[10] According to Fogg, the more of this documentation that is available, the more value added to the aircraft. Fogg followed this procedure in appraising the Challenger 300.

Highlighting the importance of aircrafts' engines, Fogg explained that any engine failure or damage could cause an accident or affect the value of the plane. And, as "very expensive" parts "of the overall airframe," engines represent "a very large percentage of the [aircraft's] value." Thus, "[t]he health and care of those engines is very important to the overall airplane." For appraisal purposes, Fogg explained that he can gauge the overall condition of the engine by "just eyeballing it"—looking for certain signs that he has seen in his fifty-two years of experience, such as any dripping fluids. According to Fogg, however, the critical information about the engines is in the logbooks, which detail the complete history of any maintenance or anything done to repair or modify the aircraft since it was manufactured. This information includes whether "the engine has come on

---

[10] The technical and flight logs contain information such as the standard and mandatory services for the aircraft, the amount of hours the aircraft has been in flight, and the amount of fuel the aircraft has consumed. Fogg explained that there may "be a discrepancy between . . . the amount of hours on an aircraft . . . to the amount of hours on an engine[]" if the engine was flown on one aircraft and then moved to another.

and off." Fogg stated that keeping the logbooks up to date is "important to the health of the engine . . . [a]nd also to be able to operate [the aircraft] legally" and that "[i]f these logs are not accurate, [it] can . . . affect the value of [the] airplane"—specifically, decreasing its value and making it difficult to sell. Fogg also explained that the logs must be "true and accurate record[s] of the health [and history] of [the] engines, [and] the maintenance they received" so that the engines may be legally operated and maintained.

After inspecting the Challenger 300's logbooks, documents, and physical condition, Fogg developed his opinion for the difference between the aircraft's purchase price and its actual value due to the engine issues and Bombardier's non-disclosures. In particular, Fogg delved into the condition of the engines prior to Bombardier's sale of the Challenger 300 to SPEP and PE and the effect the engine condition may have on its value. Fogg told the jury that the significant damage to the left engine was not indicated in its logbook. He explained that damage to an engine is expected to be recorded in its logbook because it is important to trace the parts and for quality control—that is, vital data such as whether the damaged parts were replaced, what type of parts they were replaced with (such as new or used), and whether they were repaired at all has an effect on the health and value of the engine. Fogg also noted that the logbook failed to describe what work, if any, was done on the left engine and explained that this would affect the appraisal of the aircraft. Fogg revealed that "there were these strange little logbook entries" that raised his suspicions, and he "thought [that] there is something stinking going on here." He explained, "As I proceeded through the history, I noted this engine was on an airframe, off an airframe. On an airframe, off an airframe. Then it was pulled off and it sat. Then it was sent out to somebody outside of Bombardier. Something is

16

seriously wrong with . . . this engine." That "raised a lot of questions." When asked about the right engine, Fogg stated that it had previously been "repaired" and had been used to service another aircraft, but noted that "[s]omething more happened to the left engine than [to] the right engine."

Although Fogg acknowledged that Honeywell's representative testified that the engines were new before they were put on the aircraft, Fogg testified that the records indicated the engines were actually "repaired" and he disagreed that the engines were new.[11] Fogg also explained the lack of records of engine preservation, which is the procedure for maintaining an engine when it is not installed on an aircraft. The lack of records can negatively affect the value of the aircraft on which the engine is installed—in fact, Fogg explained that a potential purchaser of that aircraft would likely not even consider purchasing it. He also testified that one of the left engine removals was due to an ITT split, explaining that nothing in the engine logbook showed the extent of the split or its cause even though that should have been recorded. He stated that an ITT split indicates the engine is not running efficiently, and that an ITT split, as well as the absence of its details from the logbooks, affects its value. Fogg further stated that air time for when the engines were in flight before being used on the Challenger 300 was not properly recorded and this would also negatively affect the value.[12]

Fogg examined the aircraft marketplace in appraising the Challenger 300. He said that he "look[ed] for comparable aircraft, comparable serial numbers, comparable times, trying to get a

---

[11] Both engines were manufactured in 2008, two years before the creation of the plaintiffs' Challenger 300, and each had been installed on and removed from other aircraft.

[12] He also explained that the engine serial numbers and flight hours need to be relatively matched. The engine serial numbers matched, but the flight hours did not.

17

trend of how many [similar] aircraft are on the market, how many have been manufactured" and

determining the value "based on how . . . that particular airplane fit[s] with other aircraft in the

market at that time."[13] Fogg submitted an appraisal report, which was admitted into evidence at trial,

in which he opined as to the value of the aircraft, taking into consideration the marketplace and the

aircraft's specific issues. In the appraisal report, Fogg made the following observations about the

marketplace as a basis for his valuation:

> As of the date of this report, there are twenty-five (25) Challenger 300 models located that were listed for sale. The number of Challenger 300s listed for sale represents about 5.8% of the total number of the 428 that were produced that remain in operation. The number of Challenger 300s on the market has been increasing from 19 in August 2013 to the 25 in November and December of 2013. This upward movement in the number for sale is a little concerning, but has leveled and is still at a very low 5.8% of the total fleet. The current asking prices for the Challenger 300 models on the market with listed asking prices range from $9,750,000 to $17,700,000. The average days on the market before a sale are now averaging 216 days.

Based on this data, Fogg characterized the Challenger 300 market as "very good, active and viable."

Fogg further noted, however, "several factors that negatively impact[ed] the market value" of this

Challenger 300, such as engine "issues" that subjected the engines to "many installations,

reinstallations, preservations, parts removals, engine disassembly, engine repairs, modifications,

[and] times of storage without proper preservation."

Fogg's appraisal report explained that the left engine "was previously installed and removed

three times on two other aircraft before being reinstalled on [the Challenger 300,]" that "[v]arious

---

[13] Fogg admitted that in 2010 the market had not yet recovered from the 2008 financial crisis, so it was not a good market, but it was a "buyer's market." As such, the value percentage that Fogg attached to the diminution in value was higher in 2010 at 10%, when the purchasing parties purchased the aircraft, than in 2014, at which time Fogg would have decreased the diminution percentage to around 5–6%.

18

repairs . . . were made to the engine during these installations and removals," that "this engine experienced an [ITT] split," which required repairs, and that "an air turbine starter was changed out as well as the engine being 'disassembled into large sections to inspect oil wetted cavities.'" Further, Fogg noted in his report that the right engine was similarly "previously installed and removed twice on two other aircraft before being re-installed on the subject aircraft," and other parts were removed and various repairs were made. Fogg wrote in his appraisal report, "In my experience, it is highly unusual for a new aircraft to experience this many engine issues with what are supposed to be fully airworthy, new engines." He stated in the appraisal that the engines should be considered used and not new. Further, "because of the negative factors surrounding the engines," Fogg concluded in his appraisal report that "the market value of [the Challenger 300] is below the normal average for this type with similar time and equipment."

In calculating his valuation for the diminution in value of the Challenger 300, Fogg started with the purchase price of $19,850,000, and then he estimated the value of the warranties if the plaintiffs lost the full value of the warranties at $709,160. Because he could not simply ask Honeywell the value of the warranties, he established its value by looking at supplemental warranty programs that provide extended engine warranties on a per-hour flight basis and calculating the average hours the plaintiffs used the Challenger 300, and he multiplied those hours by the average per-hour rate of the supplemental warranties to determine what it would cost to replace lost warranty years. Fogg calculated that, based on the Challenger 300's engine history and the loss of two years

of expected warranty, the aircraft should have been sold for $17,155,840 in 2010.[14]  As such, the diminution in value, according to Fogg's testimony, was $2,694,160—$1,985,000 excluding the reduction for loss of warranty, which is about 10% of the purchase price.  Fogg admitted that aircraft valuation is "not an exact science."  He also considered the various issues with the engines and the lack of documentation of the engines' history to negatively affect the value in determining his valuation.

As explained above, Fogg provided extensive testimony regarding the issues with the engines and the inadequacy of the engine logbooks, explaining that this would negatively affect the value of the Challenger 300.  However, Fogg did not attach specific dollar figures or percentage deductions to each of these issues to show exactly how he arrived at his 10% deduction.  Nor did he examine a specific comparable aircraft; rather he conducted a general market examination for Challenger 300s. Indulging every reasonable inference in support of the verdict, we conclude that although Fogg's reasoning for his valuation could have been more substantive, he sufficiently linked his conclusions about the Challenger 300's value to available facts about its issues and the marketplace.  *See Bustamante v. Ponte,* 529 S.W.3d 447, 465 (Tex. 2017) (concluding that although the experts' testimony "could have been better," the experts did not ask the jury to take their word for it); *see also Wilson*, 168 S.W.3d at 822; *Earle*, 998 S.W.2d at 890 (holding that the expert must link his conclusions to the facts and explain the basis of his assertions).  Fogg did not leave the jury

---

[14] Even this reduced value was relatively high for Challenger 300s for sale in the marketplace at that time—Fogg testified that asking prices ranged from $9,750,000 to $17,700,000.

guessing if a vital fact exists to connect his valuation to the facts because he gave a sufficient basis for his valuation based on the available information. *See Wilson*, 168 S.W.3d at 813.

Although valuation testimony in other industries may be more thorough, the aircraft appraisal industry presents unique challenges in valuing specific aircraft. For example, finding comparable values in the marketplace tends to be difficult for aircraft, and Fogg explained that the depreciation in value of an aircraft is a "variable number."[15] And finding comparable values for aircraft with certain damage or issues may be impossible. Fogg made it clear that this particular Challenger 300 had unique issues and that the lack of documentation of all of these issues made the value uncertain for future potential buyers and for future potential repairs. For this reason, we decline to apply any bright-line rule for determining whether an expert's aircraft appraisal is conclusory as to aircraft valuation. We note that Fogg's experience with aircraft alone may be a sufficient basis for his valuation, and coupled with the engines' issues, we conclude that he provided sufficient bases for his valuation opinion. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998) (holding that experience alone may be a sufficient basis for expert testimony). The record shows that Fogg provided the jury ample evidence to conclude that the plaintiffs suffered these damages, and we decline to disturb the jury's finding. *See, e.g.*, *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (acknowledging that the jury is the sole judge of a witness's credibility). We conclude that Fogg's expert testimony was not conclusory, and therefore

---

[15] Fogg explained that while finding information about an aircraft is similar to finding information about a car, the documentation and information concerning an aircraft is more difficult to obtain. Further, Kenneth Dufour, Bombardier's expert, testified that "there are allowable variances" in the industry standards in valuating an aircraft.

the court of appeals did not err in holding that there was legally sufficient evidence to support the jury's verdict on actual damages.

Bombardier asserts a no-evidence challenge as to the warranty issue, arguing that there is no evidence to support a finding of $709,160 in damages for the lost engine warranties—specifically, asserting that the engine warranties extended to 2015 and had not expired. The parties dispute when the warranties began. The plaintiffs asserted that they lost value in the Challenger 300's engine warranties, and therefore overall value, due to confusion over the start and end dates of the warranties. A representative of Honeywell testified that Honeywell used the 2010 installation date to calculate the warranties, meaning its position was that the warranties would last five years from the 2010 purchase date.[16] The record also indicates, however, that the five-year warranties expired in 2013, as an earlier Honeywell representative stated in an email—by that calculation, the warranties expired three years after the 2010 sale to SPEP and PE and five years after the issuance of the engines' Certificates of Airworthiness, which were issued in 2008.

Question four of the jury charge asked what sum of money would reasonably compensate the plaintiffs for Bombardier's fraud, and it contained a single answer blank. Fogg provided the jury with a suggested sum of $2,694,160, which included both the diminution in value plus a reduction for lost value in the warranties. But the jury was not asked to provide specific dollar amounts to award damages for diminution in value and for lost value in warranties. The parties agreed to this

---

[16] That same representative testified that the engines were "new."

damages question and the single answer blank, and neither party objected.[17] As a consequence, we cannot determine the exact portion of the damages award that compensated the plaintiffs for warranty issues, and we cannot separate it from diminution-in-value damages, which we have already determined were supported by Fogg's non-conclusory testimony.[18] Bombardier also did not challenge the legal sufficiency of the evidence as to the purchasing parties, challenging only the expert testimony underlying the actual damages as conclusory.[19] Therefore, we do not have the

---

[17] Neither party has argued that this actual damages question with a single answer blank presents a charge error issue or asserts that the trial court erred in instructing the jury to consider commingled damage elements. *See Crown Life Ins. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000) (holding that "when a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory"); *see also Harris Cty. v. Smith*, 96 S.W.3d 230, 232–35 (Tex. 2002) (extending *Casteel* reasoning to damages questions); *Burbage v. Burbage*, 447 S.W.3d 249, 255 (Tex. 2014) (citing *Casteel* for the proposition that the commingling of "broad-form damages questions" that incorporate both valid and invalid damages elements may result in harmful error). In *Harris County v. Smith*, we held that a single broad-form question mixing valid and invalid elements of damages constitutes harmful error because an appellate court cannot determine the extent to which the jury's damages award was based on an invalid, or unsupported, element of damages. *See Harris Cty.*, 96 S.W.3d at 234. We cautioned that "asking the jury to record its verdict as to each element of damages when there is doubt as to the legal sufficiency of the evidence will permit the losing party to preserve error without complicating the charge or the jury's deliberations." *Id.* at 236. But our ruling in that case was premised on preservation—that is, that "[a] timely objection, plainly informing the court that a specific element of damages should not be included in a broad-form question because there is no evidence to support its submission, therefore preserves the error for appellate review." *Id.*; *see Burbage*, 447 S.W.3d at 255 ("[I]n situations where a party does not raise a *Casteel*-type objection, that party surely cannot raise a *Casteel* issue when it failed to preserve a claim of an invalid theory of liability that forms the basis of a *Casteel*-type error."). Here, no party raises the issue of charge error, and no party objected to the jury charge on that basis; in fact, the parties explicitly agreed to the form of question four with a single blank for actual damages. *See Burbage*, 447 S.W.3d at 258 (explaining that to preserve error, "the objection must apprise the trial court of the error alleged such that the court has the opportunity to correct the problem"). Therefore, although we note that question four arguably intermingles compensatory damages for diminution in value with damages for loss of warranty value, damages that Bombardier argues are unsupported, we express no opinion on the validity of question four under our broad-form damages question precedent.

[18] Although we can calculate the numbers the jury may have attributed to diminution in value ($1,985,000) and loss of warranty ($709,160), based on Fogg's suggestion, we do not know that the jury agreed or that these numbers were the basis for the award. Therefore, on this jury charge, we cannot say that the evidence was legally insufficient to support $709,160 in loss-of-warranty damages.

[19] As explained above, we conclude that Fogg's testimony as to the diminution in value and the value of the damages caused by the uncertainty of the warranties is not conclusory because he explained his bases for the calculations. *See Earle*, 998 S.W.2d at 890 (concluding that an expert must link his conclusions to the facts and explain the basis of his assertions).

23

ability to review the legal sufficiency of the evidence to support any particular award of damages to compensate for fraud as it relates to the engine warranties without disturbing the jury's entire answer to question four. Moreover, even if the warranties had not expired in 2013 as a matter of law, the jury was entitled to determine whether the engine issues and flawed logbooks diminished the value of the remaining warranties.[20] Accordingly, we agree with the court of appeals that there was legally sufficient evidence to support the award of actual damages for fraud.

### III. Exemplary Damages

As explained above, because the parties stipulated that SPEP and PE would be the only plaintiffs entitled to recover damages, the punitive damages award to all "plaintiffs" simply means that it was to be collected by SPEP and PE. This is clear in the trial court's judgment, which stated: "The Court further orders that in accordance with the agreed stipulation of the parties . . . the judgment may be satisfied as to all Plaintiffs by paying 50% of the judgment to SPEP Aircraft Holdings, LLC and 50% to PE 300 [L]easing, LLC." Bombardier asserts that awarding punitive damages to all eight plaintiffs when only two established liability violates Texas Civil Practice and Remedies Code section 41.003(a), which states that "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the

---

[20] The jury heard a concern about the warranty values decreasing because of Bombardier's lack of care in maintaining the logbooks, which is a separate reason for a decrease in warranty value. The warranty expressly states that the "[o]wner shall assure that the records are maintained [to] accurately reflect engine operating hours and date and extent of maintenance performed." Because Bombardier was the legal owner of the engines before the sale of the aircraft, it was responsible for keeping these records, and it failed to fulfill this responsibility. The jury was entitled to believe testimony that such failure could affect the purchasing parties' ability to succeed on warranty claims, giving it greater weight than other expert testimony in arriving at the damages award. *See Jelinek,* 328 S.W.3d at 538 ("Courts should not usurp the jury's role as fact finder, nor should they question the jury's right to believe one witness over another.").

claimant seeks recovery of exemplary damages results from" fraud. TEX. CIV. PRAC. & REM. CODE § 41.003(a). With the stipulation that only SPEP and PE can recover any damages, and the trial court judgment's recitation of that agreement, we find no violation of section 41.003 because the trial court ordered exemplary damages be paid to the two plaintiffs that the parties agreed could recover damages. As such, we reject the argument that section 41.003 bars the punitive-damages award.

Bombardier argues that even if the plaintiffs were entitled to recover on their fraud claim, they are not entitled to punitive damages because the parties agreed to bar recovery of punitive damages. Exemplary, or punitive, damages are not compensatory and are designed to punish the defendant for outrageous or morally culpable conduct and to deter the defendant and others from engaging in the same behavior in the future. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 39–40 (Tex. 1998). This Court has held that a damages-limitation clause is a limited warranty that is the basis of the bargain and will limit recovery to the limited damages. *S.W. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991) (holding that the damages-limitation clause was valid to bar a breach of warranty claim but not valid "insofar as it purported to waive liability" for a deceptive act under the Deceptive Trade Practices Act (DTPA)). We have also suggested, however, that pre-injury releases for gross negligence may be void as a violation of public policy in the personal injury context. *See Fairfield Ins. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 687 (Tex. 2008) (Hecht, J., concurring) (indicating that "[o]utside the insurance context, it is worth noting that this Court has suggested that a person's pre-injury waiver of another's liability for gross negligence is against public policy"); *Mem'l Med. Ctr. of E. Tex. v. Keszler*, 943 S.W.2d 433, 435

(Tex. 1997) (per curiam) (explaining that post-accident release is not invalid); *Crowell v. Hous. Auth. of City of Dall.*, 495 S.W.2d 887, 889 (Tex. 1973) (acknowledging that courts have found a housing authority's exemption from liability to its tenants for negligence as contrary to public policy).

We have long recognized the strongly embedded public policy favoring freedom of contract. *See, e.g.*, *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 482 (Tex. 2017); *Phila. Indem. Ins. v. White*, 490 S.W.3d 468, 471 (Tex. 2016); *Fairfield Ins.*, 246 S.W.3d at 664; *Wood Motor Co., v. Nebel*, 238 S.W.2d 181, 185 (Tex. 1951). And, absent a compelling reason, courts must respect and enforce the terms of a contract that the parties have freely and voluntarily made. *See Bradberry*, 526 S.W.3d at 482 (noting that individuals and entities can "control their destiny and structure their business interactions through agreements with other competent [individuals or entities] of equal bargaining power, absent violation of law or public policy"). "[P]arties have the right to contract as they see fit as long as their agreement does not violate the law or public policy." *Id.* at 481, 482 (explaining that "parties can contractually waive certain substantive and procedural rights").

Bombardier and the plaintiffs memorialized their agreement in two separate contracts, the purchase agreement and the management agreement. The purchase agreement provides that Bombardier will not be liable for punitive damages arising out of "services rendered or delivered under this Purchase Agreement." The management agreement similarly states: "Neither party hereto may be held liable to the other party for any indirect, special or consequential damages and/or punitive damages for any reason." Further, Crane testified that the "Purchase Agreement in essence

26

provides that [SPEP and PE purchased] a plane from Bombardier, to be managed by Flexjet, to be inspected by Flexjet, and to be accepted on [SPEP's and PE's] behalf by Flexjet."

The parties' agreement also gave Bombardier power of attorney to inspect and accept the Challenger 300. An agreement creating a power of attorney creates a fiduciary relationship. *See, e.g.*, *Jordan v. Lyles*, 455 S.W.3d 785, 792 (Tex. App.—Tyler 2015, no pet.) (explaining that the power of attorney creates an agency relationship, which is a fiduciary relationship); *see also Stephens Cty. Museum, Inc. v. Swenson*, 517 S.W.2d 257, 260 (Tex. 1974) (suggesting that operating under a power of attorney created a fiduciary relationship); *Mandell & Wright v. Thomas*, 441 S.W.2d 841, 846–47 (Tex. 1969) (explaining that a provision in the parties' contract that constituted a general power of attorney "accentuate[d] the fiduciary relationship" and placed "the very highest duty to act in accordance with that relationship"). As the holder of this power on SPEP's and PE's behalf, Bombardier owed SPEP and PE a fiduciary duty. *See Jordan*, 455 S.W.3d at 792. The fiduciary owes a duty of full disclosure of matters concerning the parties' interests and a strict duty of candor and good faith. *See id.* The fiduciary may be punished for breaching these duties. *See E.R.I. Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 870 (Tex. 2010). And the fiduciary may be held liable for breach of its fiduciary duty for committing fraud. *See id.* (holding that a "partner in a business breached his fiduciary duty by fraudulently inducing another partner to buy out his interest" and therefore the breaching party's business interest was subject to forfeiture to remedy the fraudulent conduct).

Limitation-of-liability clauses, however, are generally valid and enforceable. *See Sw. Bell Tel. Co.*, 811 S.W.2d at 577. But if the fiduciary duty owed is breached due to fraudulent conduct,

27

punitive damages may be awarded. *See* TEX. CIV. PRAC. & REM. CODE § 41.003(a) (providing that

clear and convincing evidence of fraud allows for an exemplary damages award); *Int'l Bankers Life

Ins. v. Holloway*, 368 S.W.2d 567, 584 (Tex. 1963) (explaining that a plaintiff may recover

exemplary damages under a breach of fiduciary duty claim if the breach was intentional); *see also

Brosseau v. Ranzau*, 81 S.W.3d 381, 396 (Tex. App.—Beaumont 2002, pet. denied) (noting that an

intentional breach of fiduciary duty may result in recovery of punitive damages and that

"intentional" breach means that the party holding the fiduciary duty "intended to gain an additional

unwarranted benefit"). Although the purchasing parties agreed to give Bombardier power of

attorney under the agreement, creating a fiduciary relationship, the plaintiffs did not assert a breach

of fiduciary duty claim—they asserted only breach of contract and fraud. Because there is no breach

of fiduciary duty claim and the plaintiffs did not seek exemplary damages on that basis, we decline

to decide whether a breach of fiduciary duty for fraudulent conduct would affect the validity of a

limitation-of-liability clause. *See generally Swinnea*, 318 S.W.3d at 870 (allowing forfeiture as an

equitable remedy for breach of fiduciary duty in addition to actual damages for fraud and breach of

contract, but declining to evaluate the award in light of rules applicable to punitive damages).

As the plaintiffs point out, we have held that "fraud vitiates whatever it touches." *See Hooks

v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015) (concluding that fraud prevents

the statute of limitations period from running until the fraudulent inducement was, or should have

been, discovered). The court of appeals held that the limitation-of-liability clauses were

unenforceable because Bombardier committed fraud. ___ S.W.3d at ___. The court reasoned that

"a buyer cannot be bound by an agreement waiving exemplary damages if the seller commits fraud

28

by nondisclosure." *Id.* (opining that "[t]o conclude otherwise would allow a seller to deliberately fail to disclose material facts to entice a buyer to enter a contract and then shield himself from damages to which the buyer is entitled"). We have never held, however, that fraud vitiates a limitation-of-liability clause. We must respect and enforce terms of a contract that parties have freely and voluntarily entered. *See, e.g.*, *White*, 490 S.W.3d at 471. And the plaintiffs "cannot both have [the] contract and defeat it too." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 135 (Tex. 2005); *see also In re Lisa Laser, Inc.*, 310 S.W.3d 880, 886 (Tex. 2010) (per curiam). Rather than seeking rescission of the agreements based on Bombardier's fraudulent conduct, the plaintiffs have tried to enforce the agreements, seeking an award of actual damages, while at the same time seeking to strike the limitation-of-liability clauses to receive an exemplary damages award. *See Martin v. Cadle Co.*, 133 S.W.3d 897, 903 (Tex. App.—Dallas 2004, pet. denied) ("Rescission is an equitable remedy that operates to extinguish a contract that is legally valid but must be set aside due to fraud, mistake, or for some other reason to avoid unjust enrichment."). In *Italian Cowboy Partners, Ltd. v. Prudential Insurance Company of America*, 341 S.W.3d 323 (Tex. 2011), we explained that "when sophisticated parties represented by counsel disclaim reliance on representations about a specific matter in dispute, such a disclaimer may be binding, conclusively negating the element of reliance in a suit for fraudulent inducement." *Id.* at 332. We further explained that fraudulent inducement is not always a ground to set aside a contract, stating that in certain circumstances a contract's terms may preclude a claim for fraudulent inducement with "a clear and specific disclaimer-of-reliance clause." *Id.* Similarly, Bombardier and the purchasing parties—sophisticated entities represented by attorneys in an arms-length transaction—bargained for the limitation-of-liability clauses to bar

29

punitive damages. In balancing the competing interests between protecting parties from "unintentionally waiving a claim for fraud" and "the ability of parties to fully and finally resolve disputes between them," we believe parties can bargain to limit exemplary damages. *See id.* We note that the purchasing parties did not waive a claim for fraud; they only waived the ability to recover punitive damages for any fraud. As such, the valid limitation-of-liability clauses must stand.

Further, we reject the argument that the limitation-of-liability clauses at issue can be analyzed as "as is" clauses because they do not limit actual damages. The purchasing parties agreed that the limitation-of-liability clause in the purchase agreement contains an "as is" clause in addition to barring any punitive damages. "A valid 'as is' agreement . . . prevents a buyer from holding a seller liable if the thing sold turns out to be worth less than the price paid," and therefore the buyer holds all the risk as to the quality of the property and any loss. *See Prudential Ins. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995). Valid "as is" clauses are enforceable. *See id.* And an "as is" clause can be held invalid for fraud by non-disclosure. *See id.* at 162 ("A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller."). Here, nowhere do the provisions at issue, read as a whole, limit actual damages. In fact, the management agreement clearly states that neither party "may be held liable to the other . . . for any . . . punitive damages *for any reason*"—presumably, including delivery of an aircraft with engine issues—providing an absolute bar to punitive damages.[21] Although the jury found that Bombardier committed fraud by

---

[21] The purchase agreement does not contain the "for any reason" language. The purchase agreement states, in part: "Flexjet will not be liable to either customer for any indirect, special, consequential damages or punitive damages arising out of any lack or loss of use of any aircraft, equipment, spare parts, maintenance, repair or services rendered or

non-disclosure, and fraud may vitiate an "as is" clause, the "as is" clause here has no effect on SPEP's and PE's inability to recover exemplary damages under the limitation-of-liability clauses. *See Hooks*, 457 S.W.3d at 57 (holding, in the statute of limitations context, that "[f]raud vitiates whatever it touches"). Further, because of our holding that the limitation-of-liability clauses barred the punitive damages award, any argument that the punitive damages award is inflated because the jury awarded punitive damages based on all eight plaintiffs need not be addressed.[22]

Under our strongly held principles of freedom to contract, we hold that the limitation-of-liability clauses are valid limited warranties that were the basis of the parties' bargain. *See Sw. Bell Tel. Co.*, 811 S.W.2d at 577. Although Bombardier's conduct in failing to provide SPEP and PE with the new engines they bargained for was reprehensible, the parties bargained to limit punitive damages, and we must hold them to that bargain.[23]

## IV. Conclusion

First, we hold that the definition of "plaintiffs" in the jury charge as including all eight plaintiffs, rather than just SPEP and PE, had no effect on the trial court's judgment, and therefore the court of appeals did not err in upholding the award of damages to be collected by SPEP and PE.

delivered under this Purchase Agreement." The management agreement, in full, states: "Neither party hereto may be held liable to the other party for any indirect, special or consequential damages and/or punitive damages for any reason, including delay or failure to furnish the aircraft or by the performance or non-performance of any management services covered by this management agreement."

[22] If Bombardier worried about inflation of the exemplary damages, it could have objected to the jury charge's definition of the "plaintiffs" as all eight plaintiffs—especially in light of the fact that it stipulated that only two of the plaintiffs could recover damages. We also note that the parties agreed that the punitive damages award would be two times the actual damages award. As such, the jury awarded punitive damages according to the parties' agreement and could not have "inflated" the award based on additional plaintiffs.

[23] We do not reach Bombardier's alternative issue contending that the award of exemplary damages is constitutionally excessive.

Next, we hold that Fogg's testimony concerning the valuation of the aircraft was not conclusory, and therefore the court of appeals did not err in finding it legally sufficient to support the actual damages award. We decline to disturb the entire actual damages award under jury charge question four because damages for diminution in value and for loss in warranty value were combined into a single question with one answer blank, to which the parties agreed. Finally, we hold that the parties' limitation-of-liability clauses in their agreements barred the punitive damages award under the circumstances. We affirm the court of appeals' judgment in part, upholding the actual damages award. We reverse the part of the court of appeals' judgment to the extent that it affirmed the exemplary damages award, and we render judgment that the plaintiffs take nothing on their exemplary damages claim.

_____
Paul W. Green
Justice

OPINION DELIVERED: February 1, 2019